641 F.2d 619
 CALIFORNIA MEDICAL ASSOCIATION, a not-for-profit
unincorporated association, California Medical Political
Action Committee, a political committee, Sidney E. Foster,
M.D., and E. Kash Rose, M.D., Plaintiffs-Appellants,
v.
FEDERAL ELECTION COMMISSION, Honorable Joan D. Aikens,
Chairman, Honorable Robert O. Tiernan, Vice-Chairman,
Honorable Thomas E. Harris, Commissioner, Honorable John
McGarry, Commissioner, Honorable Vernon E. Thompson,
Commissioner, Honorable Max Freidersdorf, Commissioner,
Honorable J. Stanley Kimmit, Secretary, United States Senate
and Ex-Officio Member of the Federal Election Commission,
Honorable Edmund L. Henshaw, Jr., Clerk, House of
Representatives and Ex-Officio Member of the Federal
Election Commission, Defendants-Appellees.
 No. 79-4426.
 United States Court of Appeals,
Ninth Circuit.
 May 23, 1980.
 
 Rick C. Zimmerman, Hassard, Bonnington, Roger & Huber, San Francisco, Cal., for plaintiffs-appellants.
 David Branch, Washington, D. C., on brief; Charles N. Steele, Washington, D. C., for defendants-appellees.
 Appeal from the United States District Court for the Northern District of California.
 Before WRIGHT, CHOY, GOODWIN, WALLACE, SNEED, KENNEDY, ANDERSON, HUG, and TANG, Circuit Judges.*
 KENNEDY, Circuit Judge:
 
 
 1
 This is an appeal from an order of the district court certifying four questions concerning the constitutionality of limits on contributions to a political action committee under the Federal Election Campaign Act as amended in 1976.[1] 2 U.S.C. §§ 431-442, 451-455 (1976) (as amended, 1980). We hear the appeal en banc pursuant to Fed.R.App.P. 35. Standing and jurisdiction are conferred by, inter alia, 2 U.S.C. § 437h(a) (1976). See Buckley v. Valeo, 424 U.S. 1, 8-12, 96 S.Ct. 612, 629-31, 46 L.Ed.2d 659 (1976) (per curiam).
 
 
 2
 The case turns on important statutory provisions pertaining to entities defined by the Act as political committees. CALPAC is a political committee affiliated with the California Medical Association (CMA). CALPAC and CMA were two of the plaintiffs below. The other plaintiffs were individual members of CMA named Foster and Rose, who are eligible voters with standing to bring the action pursuant to 2 U.S.C. § 437h(a) (1976). The plaintiffs below are appellants here.
 
 
 3
 The appellants make two principal arguments. First, they contend the Act's limit on contributions by CMA to CALPAC is an infringement of their first amendment right of speech and political expression. Second, the appellants challenge the FEC's interpretation of the Act which requires that administrative support given by associations such as CMA to a multicandidate political committee must be counted as part of the dollar limit set on payments to such committees, when, by contrast, a labor union or corporation may give unlimited administrative support to a subspecies of political committee designated under the Act as a "segregated fund." The appellants allege that the FEC's interpretation of the Act is incorrect as a matter of statutory construction, or, that if it is correct, it is unconstitutional. Each of the appellant's principal contentions is erroneous and each is rejected.
 
 
 4
 * In 1976 the Supreme Court held it was constitutional to limit contributions to candidates in federal elections to $1,000. Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). Following the Buckley decision and as a matter of legislative grace,[2] Congress opened a wider avenue by which individuals could channel funds to candidates: any person, including both natural persons and various kinds of organizations, could contribute up to $5,000 to multicandidate political committees, which in turn could contribute up to $5,000 to each candidate. In this way Congress permitted greater individual contribution possibilities.
 
 
 5
 Appellants would have us dramatically widen this avenue of indirect contributions to candidates. They use the statutory rule permitting a corporation or union to furnish limited kinds of clerical and similar services to its own segregated fund as a fulcrum in an attempt to dislodge as unconstitutional a critical provision of the Act which limits an association's payments to political committees. The irony of the argument is that corporations and unions are entities generally forbidden to influence federal elections by either expenditures or contributions. To accept appellants' constitutional theory would allow associations to channel to any and all political committees, and thence to candidates, unlimited amounts of cash, services, or other things of value. To drive this wedge through the narrow aperture of section 441a would be to shatter the careful design of the Federal Election Campaign Act. The first amendment does not compel or support that result.
 
 
 6
 Our colleagues in dissent propose a theory that not only would strike down the provisions before us but also would portend grave consequences for other major features of the Act, not the least of which are the $25,000 annual limit on aggregate individual contributions and the rule that corporations and unions can make no campaign contributions or expenditures at all. Furthermore, an incidental, but nevertheless far-reaching, consequence of the dissent would be to grant associations a special privilege of unlimited and direct contribution ability, a privilege not extended to individual persons.[3] That distinction appears to us quite unsupportable.
 
 
 7
 The provisions we examine here were designed to protect the integrity of the political process and to insure that political debate and political speech are effective, and in this regard Congress acted to vindicate first amendment interests, not to derogate them. We find therefore, that the statutory provisions challenged in this case are constitutional.
 
 II
 
 8
 $5,000 Limit on Payments to Political Committees
 
 
 9
 As enacted in 1974, the Federal Election Campaign Act imposed dollar limitations both on contributions to candidates and on independent expenditures made by or on behalf of candidates in federal elections. The provisions on candidate contributions were held valid but limits on independent expenditures by or on behalf of candidates were held unconstitutional in Buckley v. Valeo, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). In response to the decision, Congress amended the Act. Federal Election Campaign Act Amendments of 1976, Pub.L.No.94-283, 90 Stat. 475 (codified in 2 U.S.C. §§ 431-442, 451-455 (1976) (as amended, 1980)). Consistently with the mandate of the Supreme Court, Congress amended the Act to remove any limitations on independent expenditures. Congress enacted new limitations on permissible payments to political committees, 2 U.S.C. § 441a(a)(1)(C) (1976). It is apparent, therefore, that Congress considered payments to a multicandidate political committee to be subject to the same regulatory power, from a constitutional standpoint, as campaign donations made directly to candidates. Upon consideration of the statutory definition of a political committee and by reason of the substantial latitude permitted associations for political expression, including the right to make unlimited expenditures except for direct candidate contributions or payments to multicandidate political committees, we hold that the Congress was correct in its judgment. Appellants make the assertion that Congress had a very limited purpose for enacting the $5,000 limitation,[4] and then proceed to declare that its purpose, as so defined, is just as readily accomplished by other provisions of the Act. They state that the $5,000 limit is only to prevent funneling contributions to a particular candidate and cite section 441a(a)(7)(B)(i) to show that indirect funneling to specific candidates is separately forbidden. This is a crabbed view of the Act and an unrealistic appraisal of the definition and role of a multicandidate political committee.
 
 
 10
 At the outset it should be noted that a person or an organization, such as CMA, can contribute each year no more than $1,000 to any candidate. 2 U.S.C. § 441a(a)(1)(A). This provision, as we have said, was expressly validated in Buckley. A political committee qualified as a multicandidate committee, as CALPAC is, may give a maximum of $5,000 per year to any one candidate. 2 U.S.C. § 441a(a)(2)(A). If the limits on payments to a political committee were to be erased, any association could give unlimited funds to a political committee. Donors could in effect use the multicandidate committee as a vehicle for making $5,000 contributions to an unlimited number of candidates and thereby influence, in fact as well as appearance, the use of vast and substantial sums for direct candidate contributions. That would be an egregious distortion of the existing contribution limits of the Act, provisions specifically sustained by the Court in Buckley.
 
 
 11
 The 1976 amendments gave political action committees great and unusual powers in comparison to either candidates or individuals: Political action committees are unlimited in the total amounts of money they receive, expend, and contribute to candidates. To vest such extraordinary power in political action committees, without some reasonable limits such as section 441a(a)(1)(C) on how they can collect money, would be to create novel and potentially enormous opportunities for corruption. As one study has concluded, even as limited by section 441a(a)(1)(C), political action committees have become vast, unaccountable, and low visibility centers of electoral influence that effectively detach candidates from their nominal geographic constituencies. See Institute of Politics, John F. Kennedy School of Government, Harvard University, An Analysis of the Impact of the Federal Election Campaign Act, 1972-78, Prepared for the House Comm. on House Admin., 96th Cong., 1st Sess. 4-5 (Comm. Print 1979) (hereinafter cited as FECA Impact Analysis).
 
 
 12
 The purpose of the $5,000 limitation, therefore, is to prevent the aggregation of funds for contribution purposes so that candidates as a class identified or not are not beholden to or influenced by a multicandidate political committee or its principal supporter, and so that the multicandidate political committee cannot become the vehicle for an association to increase its permitted contributions on a wide scale. The limitation on contributions to multicandidate political committees is necessary for this purpose and it is closely tailored to fit it.
 
 
 13
 There is a necessity for a limitation on payments to multicandidate political committees if the candidate contribution limits are to remain workable. The discussion above also points out the essential fact that a political committee is, by design as well as definition, a natural conduit for candidate contributions and that the essential purpose of the provision here in question is to limit those contributions, not to limit expenditures for any other type of political advocacy. It is an inevitable fact of politics that there will be strong gravitational attraction between political committees and candidates. Multicandidate political committees are natural targets for candidate influence, and from this it follows that there will be temptations to characterize what in fact are contributions as expenditures, contrary to the strictures of the Act. This description of the purpose and effect of the Act fits with the findings of Congress:
 
 
 14
 The conferees' decision to impose more precisely defined limitations on the amount an individual may contribute to a political committee, other than a candidate's committees, and to impose new limits on the amount a person or a multicandidate committee may contribute to a political committee, other than candidates' committees, is predicated on the following considerations: first, these limits restrict the opportunity to circumvent the $1,000 and $5,000 limits on contributions to a candidate; second, these limits serve to assure that candidates' reports reveal the root source of the contributions the candidate has received; and third, these limitations minimize the adverse impact on the statutory scheme caused by political committees that appear to be separate entities pursuing their own ends, but are actually a means for advancing a candidate's campaign.
 
 
 15
 H.R.Rep.No.10057, 94th Cong., 2d Sess. 31, 57-58 (1976), reprinted in (1976) U.S.Code Cong. & Admin.News, pp. 929, 946, 972-73. The accuracy of this judgment has since been confirmed by a study commissioned by the House of Representatives. See FECA Impact Analysis, supra.
 
 
 16
 Even if the purpose of the limit were narrowly confined, as the appellants view it, to the first two of the goals listed above, it would not be redundant. It is quite plausible that the difficulty of tracing funneling to candidates, especially by tacit arrangements falling short of coordination, is sufficiently great that a preventive limitation is required in the form of an absolute dollar ceiling on the ability of "persons" (including associations) to contribute to political action committees (which might then "funnel" excessively to candidates). A similar preventive measure based on this kind of enforcement difficulty was specifically approved by Buckley, see 424 U.S. at 27-30, 96 S.Ct. at 638-40. But, even more important, the $5,000 limit serves the additional goals described earlier. See pp. 624-625, supra.
 
 
 17
 A multicandidate political committee, such as CALPAC, is, by statutory definition and as a practical matter, an entity with a dominant function of making direct political contributions to candidates. The statute defines such a committee as an entity which has been in existence for six months, has received contributions from fifty or more persons, and has made contributions to five or more candidates. 441a(a)(4). We conclude, therefore, that a multicandidate political committee is sufficiently related to the mechanisms of the Act regulating candidate contributions that the validity of the limits here in question must be sustained upon the authority of Buckley.[5]
 
 
 18
 It appears also from an examination of the statutory history quoted above that Congress also was concerned about preventing any one person or association from dominating a multicandidate political committee, thereby gaining control over the contributions made by others. It works at cross purposes, therefore, for the appellants to insist that CALPAC is simply the mouthpiece of CMA. As noted, a multicandidate political committee by definition must receive funds from more than fifty persons. Indeed, one of appellants' major objections is that the Act impairs CMA's ability to use a political committee as a vehicle for transmitting as much of its revenue as possible directly to candidates. Therefore, appellants do not, and cannot, equate the limit on payments to the committee with a restriction that is unrelated to a regulation of candidate contributions.
 
 
 19
 The limit on payments to a multicandidate political committee does not intrude upon the right of associations except in a most minimal way. A critical point in this case is that CMA and any other association may spend as much as it chooses to collect for political speech, including advocacy of a particular candidate's election. The limitation here in question applies only to candidate contributions and payments to multicandidate political committees. And the intrusive potential of the limitation is further diminished when it is noted that, as forcefully and often as it chooses, CMA can solicit its members, and anyone else, to give directly to CALPAC. Thus, if CMA members do equate their own interest with that of CALPAC, they can support CALPAC as individuals.
 
 
 20
 The first amendment analysis of the Supreme Court in Buckley controls this case and supports the conclusion that payments to a political committee may be restricted consistently with the Constitution. Buckley, and the more recent decision in First National Bank v. Bellotti, 435 U.S. 765, 98 S.Ct. 1407, 55 L.Ed.2d 707 (1978), stand for the central proposition that the ideal of the first amendment, certainly in respect to political expression, is to permit the maximum "quantity of political speech," as determined by the speaker. See Buckley, supra, 424 U.S. at 17, 18, 19, 39, 55, 96 S.Ct. at 633, 634, 635, 644, 652. The attempted restrictions on campaign expenditures in both cases were held invalid because political speech in its essential aspect was diminished. The Court's decision in Buckley stands for the further proposition that spending is entitled to the maximum protection when the speaker and the spender are one and the same. 424 U.S. at 20-21, 96 S.Ct. at 635. At that point the individual and idiomatic character of political speech is at its highest, for the articulation of the idea is by the one who originates the speech. By contrast, the donee of a contributor has the power to distort, alter, or transform the contributor's message. This was the rationale the Court used to strike down attempted limits on expenditures by political advocates or by candidates on their own behalf, and to sustain limits on campaign contributions. Id.
 
 
 21
 Campaign contributions, by contrast with expenditures, were viewed by the Court primarily as symbolic acts showing support, rather than as expository acts of advocacy. A contribution is potential speech dependent upon the recipient for its ultimate articulation. The articulation of ideas by a speaker is more central to political expression than is the symbolic support embodied in a contribution, which is essentially a proxy.
 
 
 22
 By contrast with a limitation upon expenditures for political expression, a limitation upon the amount that any one person or group may contribute to a candidate or a political committee entails only a marginal restriction upon the contributor's ability to engage in free communication.
 
 
 23
 424 U.S. at 20-21, 96 S.Ct. at 635 (emphasis added). See also id. at 23, 96 S.Ct. at 636 ("expenditure ceilings impose significantly more severe restrictions" than contribution limits), 21, 96 S.Ct. 635 (contribution is "undifferentiated, symbolic act"), 39, 96 S.Ct. 644; Polsby, Buckley v. Valeo: The Special Nature of Political Speech, 1976 Sup.Ct.Rev. 1, 20-25.
 
 
 24
 This classification of payments to multicandidate political committees as sharing the essential characteristics of candidate contributions follows from Buckley for two reasons. First, this classification is instrumental to the efficacy of a regulatory goal which the Court found constitutional, i. e., controlling payments to candidates. Second, it is consonant with the Court's analysis of the characteristics of restraints on different kinds of expression and associational rights. The regulation in question does not significantly diminish the effectiveness or the quantity of political speech. The entity wishing to enter the political debate, here an association, retains potent alternative means of expression, including the right of unlimited spending on its own and the right to urge its members, and any other interested citizens, to show support for a political committee by contributing to the committee directly. This restriction does not significantly diminish the quantity of political advocacy or alter its content over the wishes of the initial speaker. While we believe it has been demonstrated that the $5,000 limitation is closely and necessarily related to the legitimate and important objective of regulating campaign contributions, we disagree with the appellants' use of Buckley's close scrutiny of expenditure limits to attack the limits on payments to multicandidate political action committees here at issue.
 
 
 25
 In Buckley, it was evident at each point of the Court's analysis that far greater deference was given to legislative balancing in the sphere of contribution regulation than in the case of limitations on expenditures unrelated to contributions. See 424 U.S. at 44-45, 96 S.Ct. at 647 ("markedly greater burden" of expenditure limits requires stronger justification than contribution limits under "exacting scrutiny applicable to limitations on core First Amendment rights"). This follows from the Court's conclusions that contributions are somewhat removed from the core of political expression.
 
 
 26
 In Buckley the Court granted the legislature substantial deference in drawing the Act's contribution limits, without insisting upon the most narrow of categories. The Court was willing to assume that contributions in sums larger than $1,000 might in some cases be nonsuspect, but nevertheless it allowed the limit as a preventive measure. 424 U.S. at 28, 30, 96 S.Ct. at 639, 640. The Court noted also that groups could circumvent the contribution limit merely by proliferating the number of political committees, each of which would be able to make the maximum candidate contributions; yet this imprecision was permitted.[6] Finally, the Court acknowledged that challengers and minority party candidates might be adversely affected by the contribution limitations. This is a most sensitive point in the integrity of the electoral process.[7] The Court nevertheless permitted the legislation to stand, at least absent a showing of actual prejudice. It is powerful evidence that contribution limitations are a minimal intrusion upon the essentials of political speech that the Court found the Act constitutional despite these imprecisions in its operation. The limits at issue here are at least as "closely drawn," 424 U.S. at 25, 96 S.Ct. at 637, as those sustained in Buckley. The scrutiny given to a classification affecting a constitutional right is not, therefore, entirely a mechanical inquiry, determined in the abstract simply by reference to which constitutional amendment is being considered. Buckley establishes that the constitutional justification required depends in part upon the degree to which the essentials of a constitutional right are exposed to regulation in the particular case.[8]
 
 
 27
 We are prepared to assume that a restriction on payments to a political committee does make association slightly less convenient. But see 424 U.S. at 22, 96 S.Ct. at 636 (inconveniencing effect of candidate contribution limits not unconstitutional because substantially equivalent forms of association still available). We think, therefore, it could not be sustained absent demonstration of a discernible, important, and legitimate policy of the Congress. We find such a policy inherent in the structure of the Act. The Act prohibits excessive contributions to candidates and the $5,000 limit properly viewed, is a proper mechanism to insure compliance with the prohibition as well as to prevent multicandidate political committees from being thrust by the statute into a position of such prominence that the legitimate objectives of the statute are defeated. The restrictions on contributions to multicandidate political committees are to prevent the fact or appearance of excessive ties between a committee or its donors, on the one hand, and direct contributions to candidates on the other.
 
 
 28
 The minimal nature of the statutory constraints, taken together with the importance of the governmental interest to be served by the regulation, operate to sustain the constitutionality of the provision in question.
 
 III
 
 29
 Administrative Support to Political Committees
 
 
 30
 The appellants argue that even if the $5,000 limitation is valid, the FEC's interpretation of the Act is incorrect in another respect because it imposes a particular burden on an association's advocacy not imposed upon the advocacy permitted corporations and unions. As interpreted by the FEC, the Act operates so that any administrative support given by an association such as CMA to a political committee is counted as a contribution subject to the Act's limits, whereas unions and corporations can provide administrative support in unlimited amounts to their segregated funds. The provision which grants unions and corporations this exemption is section 431(e)(5)(F). Appellants challenge the FEC's interpretation and claim they too are entitled to give unlimited administrative support to a political committee. The appellants argue further that even if the FEC's statutory interpretation were correct, denial of the exemption to associations is burdensome and discriminatory and thus violates their first amendment right of speech and their fifth amendment right to be free of classifications that offend due process. The entire court agrees that appellants' statutory argument is unwarranted, and the majority rejects most emphatically the conclusion that associations are burdened in a way that corporations and unions are not and that the distinctions render the limitation provision unconstitutional.
 
 
 31
 We turn first to the question of statutory interpretation. A "separate segregated fund" is simply a subspecies of political committee. All parties concede this. While the statute was ambiguous on this point at one time, recent amendments have clarified the Act, and it now provides specifically that segregated funds are political committees. See Pub.L.No.96-187, tit. 1, § 301(4)(B), 93 Stat. 1339 (1980), reprinted in (1979) U.S.Code Cong. & Admin.News, p. 2860.
 
 
 32
 The concept of a "separate segregated fund" for corporations and unions was introduced as part of the Federal Election Campaign Act of 1971.[9] Prior to this enactment, corporations and unions were simply prohibited from spending money directly or indirectly to influence federal elections. The exception was the work of Representative Hansen. The Hansen Amendment in 1971 allowed corporations and unions to help certain persons affiliated with them in interest to organize and to participate in political spending, while direct corporate and union participation in influencing elections remained prohibited. Contributions or expenditures by corporations and unions remained unlawful, but the Hansen Amendment permitted "the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes." 2 U.S.C. § 441b(b)(2)(C) (1976). The legislative history of this amendment is nearly nonexistent,[10] but the general purpose seems to have been to continue the prohibition against vast corporate or union revenues being used in active electioneering while permitting the practice, which had persisted even before the Hansen Amendment specifically permitted it, of a corporation's or a union's serving as a focal point for the interests of closely affiliated persons. Thus, a corporation or union could serve as a clearinghouse to facilitate individual or pooled individual political participation, but could not participate itself.
 
 
 33
 The question, raised by appellants, whether or not organizations such as CMA can be embraced by the phrase "membership organizations," thus falling within the exemption for unlimited administrative support under sections 431(e)(5)(F) and 441b(b)(2)(C), must be answered in the negative, at least in the sense that appellants ask it. The legislative history indicates that the "membership organizations" language was only intended to rescue organizations that would otherwise fall within section 441b's blanket prohibition of any election activity; CMA is not such an organization.[11] This interpretation, moreover, is consistent with the FEC's own interpretation of the statute, and we owe deference to the agency that administers the Act. See Andrus v. Sierra Club, 442 U.S. 347, 358, 99 S.Ct. 2335, 2341, 60 L.Ed.2d 943 (1979).
 
 
 34
 We do not agree with the appellants' suggested interpretation of the statute under which an association would be entitled to furnish unlimited administrative support to a political committee. Associations are limited in the contributions that they may make to political committees by the terms of section 441a(a)(1)(C). The term "contribution" is defined in section 431(e). That definitional section does provide an exemption for administrative support, but by its terms the exemption is confined only to "a corporation or a labor organization." Under no permissible interpretation of this statute can we conclude that associations, such as CMA, are within this exclusion. We agree, therefore, that the value of administrative services donated by an association to a political committee is included in computation of contributions for purposes of the $5,000 limit imposed by section 441a.
 
 
 35
 We turn finally to appellants' arguments that they are disadvantaged vis-a-vis a union or a corporation. The reason Congress did not provide an unlimited exemption for an association to render administrative services to political committees, while a somewhat similar exemption was granted to corporations and unions for segregated funds,[12] is that an association is regulated for entirely different purposes and by an entirely different statutory scheme from the one applicable to corporations and unions. See generally F. Hilder & T. Watkins, Regulation of Corporate Political Activity (BNA Corporate Practice Series No. 16, 1979). It is quite beside the point to argue that " . . . unincorporated associations may annually donate no more than $5,000 in money or administrative support to political committees, while corporations and labor organizations may annually give such committees unlimited administrative support." The phrase "such committees" obscures the fact that a committee in the case of a corporation or union means only a segregated fund. The fundamental distinction between the regulatory scheme applied to segregated funds maintained by corporations or unions, on the one hand, and the operation of political committees funded by associations on the other, prevents simple comparison between the two. This misapprehension leads to an entirely false issue, i. e., an attempted comparison between these entities. The false comparison cannot be used to declare a major portion of the Act unconstitutional. Without the exemption for administrative support, corporations and unions simply could not maintain segregated funds. But segregated funds are different from all other kinds of political committees. Segregated funds can be maintained only for individuals in a narrowly defined class, solicited under the Act's severe restrictions. A corporation or union may solicit only for its own segregated fund, and even then solicitation is restricted in other respects, e. g., solicitations are permitted only twice a year. 2 U.S.C. § 441b(b)(4)(B) (1976).
 
 
 36
 Corporations and unions, moreover, are flatly forbidden by the Act to make any expenditures or contributions to influence federal elections. By contrast, associations can spend unlimited amounts. Associations may also make unlimited solicitations for contributions to political committees. A solicitation may run to all persons without restriction. Any comparison between the rule that allows corporations and unions to maintain a segregated fund, on the one hand, and the rule that administrative support is counted toward an association's committee contribution on the other, is entirely misplaced. It is not true a priori or from the face of the Act, and we doubt that it can be shown empiracally, that corporations or unions by use of segregated funds can match in any degree the power of associations to influence federal elections, whether or not associations choose to exercise that power alone, or through political committees. The comparison is inapt, and no constitutional discrimination or first amendment burden or injury can be demonstrated from the differential treatment.[13]
 
 
 37
 The rule that administrative assistance from an association is counted as a contribution when rendered to a political committee would, of course, be invalid if it did not serve a legitimate purpose, and therefore it must be examined under its own terms, even if it is not invalid by comparison to the restrictions upon a union and a corporation. We have already concluded that there is a legitimate purpose for a limit on an association's contributions to political committees. The administrative assistance provisions are simply a necessary part of this statutory scheme. The Act prevents evasion by including administrative assistance in computation of the dollar limit. Since there is a valid purpose in limiting such contributions, the Act's inclusion of administrative support as part of contribution limits is a proper concomitant regulation and is constitutional. The claims of the appellants are therefore rejected, and each of the certified questions is answered in the negative.
 
 IV
 
 38
 The questions we have addressed were certified in accordance with a procedural section of the Act, 2 U.S.C. § 437h, which additionally states that "all questions of constitutionality of this Act" shall be heard by "the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." Various difficult questions can be raised about the meaning and constitutionality of the section's en banc requirement. These include the extent to which the breadth of the statutory phrase "all questions of constitutionality" may trench upon a court's independence in the manner and scope of its decisionmaking. See generally Leventhal, Courts and Political Thickets, 77 Colum.L.Rev. 345 (1977); Redish and Woods, Congressional Power to Control the Jurisdiction of Lower Federal Courts: A Critical Review and a New Synthesis, 124 U.Pa.L.Rev. 45 (1975). The suggestion in Judge Wallace's concurring opinion that a proper construction of the language is to limit en banc hearings to cases presenting issues of "facial" validity, contrasted with "as applied" validity, does not avoid difficult constitutional questions, and it may compound them. In any case, an analysis that is "facial" and yet which purports to answer certified questions concerning CMA only is an anomaly. The negative implication that filing a 437h certificate confines the court to a range of questions more narrow than might otherwise be the case is troubling. The distinction between facial issues and other issues, moreover, is an unstable juridical category. The difficulties it presents are sufficiently metaphysical that the occasions to draw such fine lines should not be multiplied beyond necessity. See Lewis v. City of New Orleans, 415 U.S. 130, 94 S.Ct. 970, 39 L.Ed.2d 214 (1974); Broadrick v. Oklahoma, 413 U.S. 601, 93 S.Ct. 2908, 37 L.Ed.2d 830 (1973); Coates v. City of Cincinnati, 402 U.S. 611, 91 S.Ct. 1686, 29 L.Ed.2d 214 (1971); Dahnke-Walker Milling Co. v. Bondurant, 257 U.S. 282, 42 S.Ct. 106, 66 L.Ed. 239 (1921); P. Bator, P. Mishkin, D. Shapiro, & H. Wechsler, Hart & Wechsler's The Federal Courts and the Federal System 637-40 (2d ed. 1973).
 
 
 39
 Construction of section 437h is further hampered by the obscurity of its purpose. It originated as an amendment offered by Senator Buckley to expedite authoritative Supreme Court determination of the Act's constitutionality. The en banc requirement apparently was deemed to be an expediting mechanism due to a misconception that an en banc hearing was a matter of right following a hearing by a panel of three appellate judges; to require an initial en banc hearing was thus thought to eliminate a merely "preliminary" three-judge hearing. See Markup Federal Election Campaign Act Amendments of 1974, Transcript of Proceedings Before the House Comm. on House Admin., 704-11 (June 26, 1974), reprinted in Appendix to Appellees' Brief. That proposition is, of course, inaccurate: en banc hearings are discretionary. See Fed.R.App.P. 35(a). It has been suggested that the effect of an en banc requirement may be to impede rather than expedite. See Leventhal, supra, 77 Colum.L.Rev. at 384-87. We are not prepared to say that has occurred in the instant case, but if mandatory en banc hearings were multiplied, the effect on the calendars of this court as to such matters and as to all other business might be severe and disruptive.
 
 
 40
 Delicate questions such as those here suggested are to be decided only when necessary. We think the better course is to let out decision to hear the case en banc rest on our authority under Fed.R.App.P. 35. See Buckley v. Valeo, 519 F.2d 821, 902 n.2 (D.C.Cir.1975) (per curiam) (en banc), aff'd in part and rev'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam). The importance of the case warrants that determination. If Congress in its legislative discretion chooses to reexamine the en banc provision, the necessity for our addressing the point may not arise in any future case.
 
 
 41
 The foregoing explains our decision to hear the case en banc pursuant to our authority under Fed.R.App.P. 35.
 
 
 42
 EUGENE A. WRIGHT, GOODWIN, SNEED, and TANG, Circuit Judges, join in all parts of the foregoing opinion, for a majority of the court.
 
 
 43
 CHOY and HUG, Circuit Judges, concur only in Part IV.
 
 
 44
 CHOY, Circuit Judge, concurring and dissenting:
 
 
 45
 I concur with the majority's position regarding the procedure by which we took this case en banc. On the merits, I concur with the analysis made in Judge Wallace's dissent. He, however, would declare § 441a(a)(1)(C) unconstitutional in its entirety; I would hold that it is unconstitutional only as to unincorporated associations.
 
 
 46
 Since Judge Wallace's analysis relies heavily upon freedom of association, I am not certain that the statute is unconstitutional as to all persons in particular, as to individuals. Therefore, my opinion is that we should leave for another day the question whether § 441a(a)(1)(C) also is unconstitutional as to individuals and other "persons." We should not, in a Presidential election year, tinker unnecessarily with the elaborate electoral machinery Congress has erected. We would be guilty of such needless tinkering if for no substantial reason we struck down on a constitutional ground, without the benefit of briefing or argument by directly interested parties, portions of the statutory scheme that might well be constitutional.
 
 
 47
 Judge Wallace argues that Congress limited our review under § 437h to questions of facial constitutionality, and that therefore the only way to grant CMA relief is to strike down § 441a(a)(1)(C) in its entirety or, which is to say the same thing, to strike the word "person" out of § 441a(a)(1)(C), leaving nothing of meaning or effect. Since CMA is entitled to relief, Judge Wallace feels obligated to strike down § 411a(a)(1)(C) not only as to CMA and other unincorporated associations, but also as to individuals, partnerships, etc.
 
 
 48
 Whether we are confined to questions of facial constitutionality when a district court enters an order pursuant to § 437h but we decide to take the case en banc pursuant to 28 U.S.C. § 46(c) and Federal Rule of Appellate Procedure 35(a), is a question that I need not reach. My analysis of this case, like Judge Wallace's, is "facial," and falls within the boundaries of any limitation that might be contained in § 437h.
 
 
 49
 "Facial" analysis tests the constitutionality of the work of the legislative branch by considering the statutory rule in the abstract, without regard to any particular factual situation. "As applied" analysis, on the hand, tests the constitutionality of the work of the executive branch by considering the statutory rule as it has been applied in a specific factual situation. Since Judge Wallace's and my analysis of the merits applies to all unincorporated associations and does not depend on any specific factual circumstance concerning CMA, it is "facial."
 
 
 50
 Section 441a(a)(1)(C) says, "No person shall make contributions . . . to any other political committee in any calendar year which, in the aggregate, exceed $5,000." Section 431(h) defines "person" to include "an individual, partnership, committee, association, corporation, labor organization, and any other organization or group of persons." If § 441a(a)(1)(C) actually read, "No individual, partnership, committee, association, corporation, labor organization, and any other organization or group of persons shall make contributions . . . to any other political committee in any calendar year which, in the aggregate, exceed $5,000," and if the statute were unconstitutional only as to "associations," everyone would agree that even a court limited to "facial" review could easily sever the offending word and leave the rest of the statute intact.[1] But § 431(h) tells us that the word "person" is the absolute equivalent of the underlined words in my hypothetical statute. Is § 441a(a)(1)(C) not then the equivalent of my hypothetical one?
 
 
 51
 In conclusion, if Judge Wallace's position on the merits prevailed, it would be desirable to limit to unincorporated associations the holding that § 441a(a) (1)(C) was unconstitutional. This limitation would not be forbidden by § 437h's restriction of our deliberations to questions of facial validity, even if such a restriction was applicable in this case.
 
 
 52
 WALLACE, Circuit Judge, concurring and dissenting:
 
 
 53
 This case arises from the district court's order, entered pursuant to 2 U.S.C. § 437h,[1] certifying questions as to the constitutionality of certain provisions of the Federal Election Campaign Act of 1971 (FECA), 2 U.S.C. §§ 431-455. Plaintiffs are the California Medical Association (CMA), an unincorporated association; California Medical Political Action Committee (CALPAC), its political action committee; and two members of both organizations, Sidney Foster, and E. Kash Rose. Defendants are the Federal Election Commission (FEC) and its members. After the FEC commenced an investigation of CMA and CALPAC, plaintiffs sued in district court for a declaration that FECA sections 441a(a)(1)(C), 441b(b)(2)(C), 431(e)(5)(F), and 431(f)(4)(H), which prevent a person, including an unincorporated association, from contributing more than $5,000 per year to a political committee, but permit unlimited administrative support of such committees by labor organizations and corporations, are unconstitutional.
 
 
 54
 The certified questions, in summary, are (1) whether on the face of the statute, and as applied to CMA and CALPAC, the $5,000 per year restriction on support of a political action committee by an unincorporated association violates the plaintiffs' First Amendment rights to speech and association; and (2) whether on its face, and as applied to CMA and CALPAC, this $5,000 restriction, which applies to unincorporated associations but not to corporations or labor organizations, constitutes invidious discrimination in violation of the Fifth Amendment. In addition, we asked the parties to brief and argue the constitutionality of the portion of 2 U.S.C. § 437h which requires the United States Court of Appeals to hear this matter sitting en banc.
 
 
 55
 I believe the majority errs both on the merits and in its failure to come to grips with important and difficult jurisdictional issues which this case presents. I treat first the important questions raised by the majority's use of section 437h(a) to supply our interlocutory jurisdiction to decide the questions certified to us by the district court. Although I agree with the majority that we do have jurisdiction to answer the certified questions, my analysis leads me to confront and to discuss the difficult constitutional issues posed by Congress' requirement in 2 U.S.C. § 437h(a) that we hear this case while sitting en banc. I next address the question of standing and agree with the majority, for the reasons stated, that at least two plaintiffs have standing. I then explain why I cannot agree with the majority's decision on the merits.
 
 I.
 
 56
 The majority, without substantial reasoning, decides not to resolve a critical question pertaining to our jurisdiction. This issue is so fundamental to our authority to act that it must be faced squarely.
 
 
 57
 It is true that a majority of our court concluded, after this case was heard en banc, to dispose of this matter pursuant to 28 U.S.C. § 46(c) and Fed.R.App.P. 35(a). Once the question of the constitutionality of the en banc mandate embodied in section 437h(a) is removed, however, I doubt that enough remains in this case to present "a question of exceptional importance" to satisfy Rule 35(a).[2] Nor does this case present special needs for uniformity.
 
 
 58
 In addition, I question the court's curious technique of invoking section 437h(a) to confer jurisdiction over this interlocutory appeal and yet ignoring that section's simultaneous and clear command that we shall hear this appeal while sitting en banc. Once section 437h(a) is invoked, I think we must apply it in its entirety. The court's midstream switch from section 437h(a)'s explicit en banc mandate to the convenient, but irrelevant, en banc discretion provided in 28 U.S.C. § 46(c) and Rule 35(a), ignores an integral and inseparable aspect of the very basis for our jurisdiction.
 
 
 59
 Accordingly, I believe we must act pursuant to section 437h(a), and address the problems raised by Congress' imposition in that section of the en banc requirement. I would hold that section 437h(a) limits our review to the facial constitutionality of FECA provisions. I confess my difficulty in understanding the majority's criticism of a facial/as applied analysis. I find it neither an "unstable judicial category" nor "metaphysical," nor do I find in the majority opinion any analysis or authority to support such naked assertions. My reasons for my position emanate from my interpretation of section 437h(a). The statute does not contemplate an expedited, en banc consideration of the constitutionality of FECA provisions as applied to particular defendants. So limited, I would find section 437h(a) constitutional: Congress may constitutionally require this circuit to hear such facial challenges en banc, provided that, as here, we would not be required to exceed Article III's limitation on federal judicial power.
 
 
 60
 * Section 437h(a) states: "The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc." I first consider whether this provision permits expedited review of "as applied" challenges, in addition to facial challenges. The wording itself, which speaks only of the "constitutionality of this Act," is inconclusive. Thus, it is necessary to resort to legislative history to interpret the statute. See United States v. Rone, 598 F.2d 564, 569 (9th Cir. 1979).
 
 
 61
 Section 437h was part of the 1974 amendments to the Federal Election Campaign Act of 1971. As originally introduced in Congress, as S. 3044 and H.R. 16090, the 1974 amendments did not contain the expedited review mechanism now set forth in section 437h. That provision was introduced by Senator Buckley as a floor amendment to S. 3044 during the Senate debates. Upon presenting the amendment, Senator Buckley stated that it
 
 
 62
 merely provides for the expeditious review of the constitutional questions I have raised. I am sure we will all agree that if, in fact, there is a serious question as to the constitutionality of this legislation, it is in the interest of everyone to have the question determined by the Supreme Court at the earliest possible time.
 
 
 63
 120 Cong.Rec. 10562 (1974) (remarks of Sen. Buckley) reprinted in FEC, Legislative History of Federal Election Campaign Act Amendments of 1974, 499 (1977) (hereinafter cited as 1974 Legislative History ) (emphasis added). Apparently Senator Buckley was chiefly concerned with the First Amendment problems associated with the bill's expenditure limitations. See 120 Cong.Rec. 10558-64 (1974), reprinted in 1974 Legislative History at 494-99. Cf. Buckley v. Valeo, 424 U.S. 1, 39-59, 96 S.Ct. 612, 644-54, 46 L.Ed.2d 659 (1976) (per curiam) (FECA's independent expenditure limitations violate First Amendment). His stated purpose was to enable expeditious review of this "serious" constitutional question the constitutionality, on their face, of the expenditure limitations.
 
 
 64
 The Buckley Amendment (which was inserted in both S. 3044 and H.R. 16090) was subsequently modified. As originally worded, the amendment authorized actions in the district court, reviewable on certification to the court of appeals en banc, "to implement or construe any provision of the Act. . . ." 120 Cong.Rec. 10562 (1974), reprinted in 1974 Legislative History at 499. The Conference Committee limited the scope of the provision by eliminating actions merely "to implement" the Act. The Committee stated:
 
 
 65
 The conference substitute generally follows the House amendment and makes it clear that these special judicial review provisions are available only for actions directed at determining the constitutionality of provisions of the Act and of provisions of title 18, United States Code, related to the activities regulated by the Act.
 
 
 66
 S.Conf.Rep.No.1237, 93d Cong., 2d Sess. 96 (1974), reprinted in 1974 Legislative History at 499.
 
 
 67
 Senator Buckley's concern with the serious First Amendment issues raised by the legislation, and the Conference Committee's apparent intent to limit the scope of section 437h(a) to "actions directed at determining the constitutionality of provisions of the Act," indicate that Congress intended to limit judicial review pursuant to section 437h(a) to questions of FECA's constitutionality on its face. This conclusion regarding Congress' intent is apparently shared by the District of Columbia Circuit. In Buckley v. Valeo, 519 F.2d 821, 850-51 (D.C. Cir. 1975) (en banc) (per curiam), aff'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam), the court stated:
 
 
 68
 Congress was concerned with the inhibitory effect of a massive rearrangement of regulations operating upon federal campaigns and elections, and wanted election participants to be permitted expeditiously to test the facial validity of limitations and requirements imposed by the challenged Acts.
 
 
 69
 (Footnote omitted; emphasis added.)[3]
 
 
 70
 Congress' intent to limit section 437h(a) to facial challenges is further evidenced by the alternate avenue of judicial review contained in FECA's civil enforcement procedures. Section 437g(a) (as amended by Federal Election Campaign Act Amendments of 1979, Pub.L.No.96-187, § 309, 93 Stat. 1358) creates a civil complaint mechanism administered by the FEC and enforceable, if necessary, in the district court. Section 437g(a)(9) also provides for relief in the district court for those parties aggrieved by FEC enforcement orders. As to both enforcement of or relief from FEC actions, section 437g(a)(10)-(12) provides for expedited district court review (ahead of all actions save those brought pursuant to section 437h), and for appellate review. In the case before us, a section 437g(a) enforcement proceeding is presently pending.[4]
 
 
 71
 I do not think Congress intended section 437h(a) to preempt the section 437g(a) enforcement and relief procedures, in which "as applied" constitutional issues can be resolved on the complete factual record of particular transactions. Section 437g(a)(10) provides that section 437h(a) actions are docketed ahead of section 437g(a) enforcement and relief actions. This, of course, avoids the unnecessary expense and delay involved in factual determinations, as well as wasted judicial effort, whenever the charging provisions are found to be facially unconstitutional on certification to the court of appeals.[5] But nothing in the legislative history even hints that Congress intended section 437h to supplant the FECA civil enforcement and relief procedures for specific violations.[6]
 
 
 72
 An additional reason for concluding that Congress intended to limit this court's section 437h(a) review to the constitutionality of FECA provisions on their face is Congress' requirement that we must hear such challenges en banc. The significance of this requirement can best be demonstrated by a brief review of the development and implementation of the en banc procedure. Hearings en banc were implemented sua sponte by some circuit courts in the late 1930's in response to increases in the number of judges per circuit and the concomitant potential for intra-circuit conflicts. See Textile Mills Sec. Corp. v. Comm'r of Internal Revenue, 314 U.S. 326, 327-35, 62 S.Ct. 272, 274-77, 86 L.Ed. 249 (1941). In the Textile Mills case, the Supreme Court approved this use of en banc proceedings. Id. Thereafter, Congress enacted 28 U.S.C. § 46,[7] which codified the Textile Mills decision by authorizing a majority of the active judges on a circuit to order an en banc hearing.
 
 
 73
 Guidelines for en banc procedures are now set forth in rule 35(a) of the Federal Rules of Appellate Procedure:[8]
 
 
 74
 (a) When Hearing or Rehearing in Banc Will be Ordered. A majority of the circuit judges who are in regular active service may order that an appeal or other proceeding be heard or reheard by the court of appeals in banc. Such a hearing or rehearing is not favored and ordinarily will not be ordered except (1) when consideration by the full court is necessary to secure or maintain uniformity of its decisions, or (2) when the proceeding involves a question of exceptional importance.
 
 
 75
 Thus, en banc proceedings pursuant to the authority of 28 U.S.C. § 46 are afforded only to promote or secure uniformity within a circuit or in cases of exceptional importance. Moody v. Albemarle Paper Co., 417 U.S. 622, 626, 94 S.Ct. 2513, 2515, 41 L.Ed.2d 358 (1974); United States v. American-Foreign SS. Corp., 363 U.S. 685, 689, 80 S.Ct. 1336, 1339, 4 L.Ed.2d 1491 (1960).
 
 
 76
 In enacting 2 U.S.C. § 437h(a), Congress legislated against this en banc background. Although I would not hold, as an original matter, that the questions posed by this case are of such "exceptional importance" as to warrant ad hoc en banc treatment pursuant to 28 U.S.C. § 46(c) and Rule 35(a), Congress could find that, in general, challenges to the facial constitutionality of FECA provisions are sufficiently important to require en banc treatment. Judgments as to facial constitutionality necessarily have wide-ranging impact. In contrast, individual enforcement proceedings, while perhaps of transcendent importance to the particular parties involved, do not present issues of such national significance. Senator Buckley's concern was to expedite judicial resolution of the "serious question" of the constitutionality of certain FECA provisions. See 120 Cong.Rec. 10562 (1974), reprinted in 1974 Legislative History at 499. The use in section 437h(a) of the en banc procedure to entertain such "serious questions" of facial constitutionality is not inconsistent with the "exceptional importance" limitations historically placed upon the en banc procedure.[9] There is no evidence of congressional intent to abrogate these limitations, which are based on sound principles of judicial administration. I would interpret section 437h(a), in light of the legislative history already reviewed, as expressive of congressional intent that we limit our review to FECA's facial constitutionality. It is therefore necessary to consider whether Congress constitutionally can require this court to decide questions of FECA's facial constitutionality while sitting en banc.
 
 B
 
 77
 Article III of the Constitution empowers Congress to ordain and establish inferior courts of appellate jurisdiction and to limit and regulate the Supreme Court's appellate jurisdiction. U.S.Const. art. III, §§ 1, 2 cl. 2; Ex parte McCardle, 74 U.S. (7 Wall.) 506, 513, 19 L.Ed. 264 (1869); see Palmore v. United States, 411 U.S. 389, 400-01, 93 S.Ct. 1670, 1678 (1973). Although Congress has generally delegated to the judiciary the power to make rules governing judicial practice and procedure, the final authority for rulemaking rests ultimately with Congress. Hanna v. Plumer, 380 U.S. 460, 472, 85 S.Ct. 1136, 1144, 14 L.Ed.2d 8 (1965); Sibbach v. Wilson & Co., 312 U.S. 1, 9-10, 61 S.Ct. 422, 424, 85 L.Ed. 479 (1941).
 
 
 78
 There are, however, some limits on congressional authority over the judiciary; for example, Congress may not undermine the courts' capacity to make independent determinations of questions of law or fact in particular cases. Crowell v. Benson, 285 U.S. 22, 60, 52 S.Ct. 285, 296, 76 L.Ed. 598 (1932). See also United States v. Klein, 80 U.S. (13 Wall.) 128, 147, 20 L.Ed. 519 (1872) (statute compelling court to ignore certain evidence which court believed to be relevant "passed the limit which separates the legislative from the judicial power"). Commentators have suggested that Congress' power to limit and regulate federal appellate jurisdiction is circumscribed by the doctrine of separation of powers and the Fifth Amendment's due process clause. It has been urged, for example, that Congress may not make such exceptions to appellate jurisdiction "as will destroy the essential role of the Supreme Court in the constitutional plan." Hart, The Power of Congress to Limit the Jurisdiction of Federal Courts: An Exercise in Dialectic, 66 Harv.L.Rev. 1362, 1365 (1953). See generally Ratner, Congressional Power of the Appellate Jurisdiction over the Supreme Court, 109 U.Pa.L.Rev. 157 (1960). Others believe that in cases where "due process is . . . judicial process," Crowell v. Benson, supra, 285 U.S. at 87, 52 S.Ct. at 306 (Brandeis, J., dissenting), the Fifth Amendment prevents Congress from closing off all avenues of judicial relief. See generally Eisenberg, Congressional Authority to Restrict Lower Federal Court Jurisdiction, 83 Yale L.J. 498 (1974); Redish & Woods, Congressional Power to Control the Jurisdiction of Lower Federal Courts: A Critical Review and a New Synthesis, 124 U.Pa.L.Rev. 45 (1975). Were Congress to require en banc facial review in many additional categories of cases, or, under FECA, in "as applied" cases, the workload of the courts of appeals might become so burdensome, and our backlog so overwhelming to litigants, that our capacity to provide adequate judicial process would be unconstitutionally threatened. But the present mandate commands us only to decide facial questions, once and for all, in a single en banc proceeding. The line beyond which congressional regulation of judicial procedure and jurisdiction unconstitutionally constrains the judicial function remains very hazy. I think it is clear, however, that Congress can require us to sit en banc to hear and decide questions of FECA's facial constitutionality without undermining the separation of powers contemplated by Article III or our capacity to afford the due process required by the Fifth Amendment. The wisdom of this en banc mandate is debatable,[10] but it is not unconstitutional.
 
 II
 
 79
 Having concluded that we have power to hear this appeal, I turn next to the question of whether the plaintiffs have standing to bring this controversy before us. Without analysis, the majority summarily states a naked conclusion. The issue deserves more.
 
 
 80
 In Buckley v. Valeo, 424 U.S. 1, 11-12, 96 S.Ct. 612, 631, 46 L.Ed.2d 659 (1976) (per curiam), the Supreme Court held that "Congress, in enacting 2 U.S.C. § 437h . . . intended to provide judicial review to the extent permitted by Art. III." (Footnote omitted.) Our jurisdiction under section 437h(a) is thus constrained only by Article III's "cases and controversies" limitation. Prudential limitations are not applicable.[11] Accordingly, it is necessary to ascertain whether any of the plaintiffs
 
 
 81
 have a sufficient "personal stake" in a determination of the constitutional validity of each of the challenged provisions to present "a real and substantial controversy admitting of specific relief through a decree of a conclusive character, as distinguished from an opinion advising what the law would be upon a hypothetical state of facts." Aetna Life Ins. Co. v. Haworth, (300 U.S. 227) 241 (57 S.Ct. 461, 464, 81 L.Ed.2d 617 (1937)).
 
 
 82
 Id. (footnotes omitted).
 
 
 83
 Two of the plaintiffs, Foster and Rose, are "individual(s) eligible to vote in any election for the office of President of the United States," 2 U.S.C. § 437h(a), and are thus granted a statutory right to sue pursuant to section 437h(a). Whether either individual has a sufficient personal stake in the outcome of this controversy to meet the Article III requirement must be determined.
 
 
 84
 Foster and Rose allege that FECA's restriction on CMA's support of CALPAC abridges their First Amendment rights, as members of these organizations, to communicate political ideas and to associate for the purpose of participating in federal elections. The First Amendment freedom of association protects an association's ability to amplify effectively the voices of its adherents. Buckley v. Valeo, supra, 424 U.S. at 22, 96 S.Ct. at 636; see NAACP v. Alabama, 357 U.S. 449, 460, 78 S.Ct. 1163, 1170, 2 L.Ed.2d 1488 (1958). Foster and Rose essentially allege that their political voices are unconstitutionally weakened by the FECA restrictions on CMA and CALPAC.
 
 
 85
 In Buckley, the Court invalidated FECA's restrictions on independent (of the candidate) campaign expenditures made in behalf of clearly identified candidates. The Court stated:
 
 
 86
 The Act's constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression "is simultaneously an interference with the freedom of (their) adherents," Sweezy v. New Hampshire, 354 U.S. 234, 250 (, 77 S.Ct. 1203, 1212, 1 L.Ed.2d 1311) (1957) (plurality opinion).
 
 
 87
 Buckley v. Valeo, supra, 424 U.S. at 22, 96 S.Ct. at 636 (emphasis added). See also id. at 75, 96 S.Ct. at 661. Thus, FECA's restrictions of CMA and CALPAC, if unconstitutional, interfere directly and simultaneously with their members' First Amendment rights. As such, Foster and Rose have a sufficient personal stake in a judicial ruling on the certified questions to create Article III standing.
 
 
 88
 Because Foster and Rose have standing, I need not consider the standing of CMA and CALPAC. See Village of Arlington Heights v. Metropolitan Hous. Dev. Corp., 429 U.S. 252, 264 n.9, 97 S.Ct. 555, 562 n.9, 50 L.Ed.2d 450 (1977). I therefore do not reach the question, on which courts have divided, whether the grant of standing in section 437h(a) is limited to the plaintiffs enumerated therein. Compare Martin Tractor v. FEC, 460 F.Supp. 1017, 1019 (D.D.C.1978) (limited), with Bread Political Action Committee v. FEC, 591 F.2d 29, 30-36 (7th Cir. 1979) (not limited).
 
 III
 
 89
 I turn now to the merits. On its face, FECA section 441a(a)(1)(C) prohibits a "person," which includes unincorporated associations, corporations, and labor organizations, 2 U.S.C. § 431(h), from contributing more than $5,000 to any type of political committee other than that of a national political party.[12] Section 441b(b)(2)(C), however, provides corporations and labor organizations with a limited exemption to this prohibition. For all FECA purposes,[13] a contribution or expenditure does not include:
 
 
 90
 the establishment, administration, and solicitation of contributions to a separate segregated fund to be utilized for political purposes by a corporation, labor organization, membership organization, cooperative, or corporation without capital stock.
 
 
 91
 2 U.S.C. § 441b(b)(2)(C).
 
 
 92
 Foster and Rose first contend that any constitutional question can be avoided by construing section 441b(b)(2)(C) to allow unlimited administrative support by an unincorporated association to its political action committee.[14] The Supreme Court has held that when the validity of an act of Congress is drawn into question and a serious doubt is raised as to its constitutionality, it is a "cardinal principle" that a court should "first ascertain whether a construction of the statute is fairly possible by which the constitutional question may be avoided." United States v. Thirty-Seven Photographs, 402 U.S. 363, 369, 91 S.Ct. 1400, 1404, 28 L.Ed.2d 822 (1971); Ashwander v. TVA, 297 U.S. 288, 348, 56 S.Ct. 466, 483, 80 L.Ed. 688 (1936) (Brandeis, J., concurring); Crowell v. Benson, supra, 285 U.S. at 62, 52 S.Ct. at 296. Unfortunately, the majority does not fully analyze the legislative history underlying this key issue. I have concluded, however, that the majority's ultimate conclusion on this issue is correct. A fair construction of the statute in this case does not permit avoidance of the constitutional issues.[15]
 
 
 93
 Foster and Rose argue that an unincorporated association, like CMA, is a "membership organization," as referred to in section 441b(b)(2)(C), and therefore is entitled to provide unlimited administrative support in the same manner as a corporation or labor organization. Although the term "membership organization" is nowhere defined in the Act, the term literally describes an unincorporated organization such as CMA. Because corporations are already specifically included within the exception, the addition of the term "membership organization" would, at first blush, seem to encompass unincorporated associations. Despite this facial clarity, the meaning of "membership organization" in section 441b(b)(2)(C) is ambiguous because the subsection applies only for the purposes of section 441b, and section 441b imposes prohibitions only on corporations and labor organizations. Because of this ambiguity, it is necessary to resort to legislative history. See United States v. Rone, 598 F.2d 564, 569 (9th Cir. 1979).
 
 
 94
 The legislative history of section 441b(b)(2)(C) suggests that Congress did not intend to apply the contribution exclusion to unincorporated associations. When first proposed in 1976 as part of the amendments to the 1971 Act, section 441b made it unlawful for a corporation to solicit contributions from anyone other than a stockholder or from administrative personnel and permitted corporations and labor organizations to provide administrative support to separate political committees. S. 3065, 94th Cong., 2d Sess. § 321 (1976), reprinted in FEC, The Legislative History of the Federal Election Campaign Amendments of 1976, 253-54 (hereinafter 1976 Legislative History ).
 
 
 95
 During the 1976 debate on section 441b, Senator Allen proposed an amendment on the Senate floor. 122 Cong.Rec. 7197-98 (1976), reprinted in 1976 Legislative History at 463-64. The amendment provided: first, that membership organizations, cooperatives, or corporations without capital stock could solicit contributions from their members (codified in 2 U.S.C. § 441b(b)(4) (C)), and second, that these same groups could provide unlimited administrative support to their separate segregated funds (codified in 2 U.S.C. § 441b(b)(2) (C)). The amendment was passed virtually without discussion, but Senator Allen's own comments[16] suggest that the purpose of his amendment was to allow corporations with a nonstockholding membership to solicit contributions from their members and to establish segregated funds in the same manner as capital stock corporations. 122 Cong.Rec. 7197-98 (1976), reprinted in 1976 Legislative History at 463-64. Senator Allen apparently believed that without this amendment such corporations would be unable to solicit on an equal basis with more conventional corporations.
 
 
 96
 I recognize the persuasiveness of the argument that an unincorporated association such as CMA should be considered a "membership organization." However, the legislative history makes it clear that section 441b(b)(2)(C) was not designed to allow unincorporated associations to provide unlimited administrative support to their political committees. Unincorporated associations were not covered by the prohibitions contained in section 441b. It is evident that Congress, in adopting the Allen amendment, was only interested in assuring that all types of corporations, including those with members rather than stockholders, would come within the administrative assistance exception to the 441b prohibition. Consequently, even though an unincorporated association like CMA is arguably a membership organization, it does not fall within the scope of the administrative support exception contained in section 441b(b)(2)(C).[17]
 
 IV
 
 97
 Given this reading of section 441b(b)(2)(C), Foster and Rose claim that the $5,000 restriction on contributions by a "person" to a political committee, 2 U.S.C. § 441a(a)(1)(C), when read in light of the administrative support exemption for corporations and labor organizations,[18] is unconstitutional on its face, in that the constitutional infirmity is revealed by examining solely the language of FECA's various provisions. They contend that the restriction abridges the speech and associational freedoms of members of an unincorporated association and its political committee, and does so discriminatorily, in that members of unincorporated associations are restrained as to providing administrative support while members of labor organizations and corporations may freely give administrative support to their political committees.
 
 
 98
 Although Foster and Rose urge separate First Amendment and equal protection claims, each claim attacks the $5,000 limitation on donations of administrative support to political committees in section 441a(a)(1)(C), a restriction that allegedly impacts directly on fundamental speech and associational interests. The paramount evil inherent in discriminatory speech restrictions is that such dissimilar treatment skews the marketplace of ideas and raises the spectre of governmental allocation of speech rights. A hallmark of First Amendment doctrine is the vigorous scrutiny of government actions which, as here, differentiate for purposes of regulation among particular persons' communications. E. g., Niemotko v. Maryland, 340 U.S. 268, 272, 71 S.Ct. 325, 327, 95 L.Ed. 267 (1951). I choose, therefore, to analyze section 441a(a)(1) (C)'s different treatment of unincorporated associations on one hand, and labor organizations and corporations on the other, in First Amendment terms. The First Amendment has generated a comprehensive and sensitive jurisprudence concerned exclusively with regulations of speech and association. Although it is hard to describe the rights of speech and association as other than "fundamental," I think that the careful scrutiny dictated by the First Amendment is more appropriate to review of regulations of speech and association than the "fundamental rights" branch of equal protection analysis. Many of the rights in the Bill of Rights are likely fundamental, but as each is specifically protected by an amendment to the Constitution, the wealth of judicial experience in interpreting these specific amendments, and the strict scrutiny they require, should be applied whenever possible.
 
 
 99
 * Both parties rely largely upon the Supreme Court's per curiam opinion in Buckley v. Valeo, supra. In Buckley, the Court struck down FECA's ceilings on campaign expenditures by candidates and by third parties on behalf of candidates, but upheld the limitations imposed on "persons" making contributions directly to candidates and political parties. The $5,000 limit on "persons' " contributions to political committees was enacted after the Buckley decision, and thus was not considered by the Court.
 
 
 100
 The Court in Buckley analyzed both the contribution and expenditure limitations solely in First Amendment terms.[19] No explicit discrimination considerations were present, because the challenged regulations applied in blanket fashion.[20] The absence of an analogous discrimination issue in the Court's First Amendment analysis distinguishes Buckley from the case before us; nevertheless, the Supreme Court's method of analyzing such similar issues should generally govern our analysis.
 
 
 101
 The Court in Buckley first isolated the speech and associational interests affected by the challenged regulations. The Court stated:
 
 
 102
 Although the Act does not focus on the ideas expressed by persons or groups subject to its regulations, it is aimed in part at equalizing the relative ability of all voters to affect electoral outcomes by placing a ceiling on expenditures for political expression by citizens and groups. . . . (I)t is beyond dispute that the interest in regulating the alleged "conduct" of giving or spending money "arises in some measure because the communication allegedly integral to the conduct is itself thought to be harmful."
 
 
 103
 Buckley v. Valeo, supra, 424 U.S. at 17, 96 S.Ct. at 634, quoting United States v. O'Brien, 391 U.S. 367, 382, 88 S.Ct. 1673, 1681, 20 L.Ed.2d 672 (1968). Furthermore, the Court stated that FECA's "constraints on the ability of independent associations and candidate campaign organizations to expend resources on political expression 'is simultaneously an interference with the freedom of (their) adherents.' " Id. at 22, 96 S.Ct. at 636, quoting Sweezy v. New Hampshire, supra, 354 U.S. at 250, 77 S.Ct. at 1212 (plurality opinion). Because of FECA's direct regulation of the communicative impact of both speech and association, the Court stated that the challenged regulations would be tested by "the exacting scrutiny required by the First Amendment." Id. at 16, 96 S.Ct. at 633.[21]
 
 
 104
 The Court then judged the contribution and expenditure limitations by balancing the particular speech and associational interests affected thereby against the government's interest in having such limitations. The Court found that FECA's expenditure ceilings "impose(d) direct and substantial restraints on the quantity of political speech," id. at 39, 96 S.Ct. at 644 and "preclude(d) most associations from effectively amplifying the voice of their adherents, the original basis for the recognition of First Amendment protection of the freedom of association," id. at 22, 96 S.Ct. at 636. In contrast, the Court found the contribution limitations to impinge less on speech and associational interests. The Court said:
 
 
 105
 (A) limitation upon the amount that any one person or group may contribute to a candidate or political campaign entails only a marginal restriction upon the contributor's ability to engage in free communication. A contribution serves as a general expression of support for the candidate and his views, but does not communicate the underlying basis for the support. . . . A limitation on the amount of money a person may give to a candidate or campaign organization thus involves little direct restraint on his political communication, for it permits the symbolic expression of support evidenced by a contribution but does not in any way infringe the contributor's freedom to discuss candidates and issues.
 
 
 106
 Id. at 20-21, 96 S.Ct. at 635-36. Moreover, although the contribution limitations restricted the ability of "like-minded persons to pool their resources in furtherance of common political goals," id. at 22, 96 S.Ct. at 636, they did "leave the contributor free to become a member of any political association and to assist personally in the association's efforts on behalf of candidates." Id.
 
 
 107
 The Court found that the "primary purpose" of FECA "to limit the actuality and appearance of corruption resulting from large individual financial contributions," id. at 26, 96 S.Ct. at 638 was better served by the contribution restrictions than by the limits on expenditures. The Court believed that the $1,000 contribution restriction[22] "focuse(d) precisely," id. at 28, 96 S.Ct. at 639, on the evils of political quid pro quo arrangements, whose actual or perceived presence threatened to undermine the integrity of our system of representative democracy. The expenditure limitations, on the other hand, did not "serve any substantial governmental interest in stemming the reality or appearance of corruption in the electoral process." Id. at 47-48, 96 S.Ct. at 648. Limitations on a candidate's personal campaign expenditures were clearly unrelated to the elimination of quid pro quo arrangements. To the extent that independent expenditures, by third parties unaffiliated with the candidate, posed quid pro quo concerns, such expenditures would be treated as "contributions" under the Act and thus separately regulated. Id. at 46-47, 96 S.Ct. at 647.
 
 
 108
 Because the Court found that the speech and associational interests abridged by the contribution limitations were only marginal, and that these limitations were closely tailored to the achievement of the government's strong interest in preventing quid pro quo arrangements, the contribution limitations were sustained. But the expenditure limitations, which implicated more substantial speech and associational interests, while furthering insubstantial government interests, were invalidated.
 
 
 109
 It is important to recognize that the Court in Buckley applied a single standard of review to both the expenditure and the contribution limitations, and that this standard of review demands careful analysis of asserted governmental objectives. In discussing the government interests that would be necessary to sustain the contribution limitations, despite the relatively modest impact of these restrictions on the freedoms of speech and association, the Court stated:
 
 
 110
 In view of the fundamental nature of the right to associate, governmental "action which may have the effect of curtailing the freedom to associate is subject to the closest scrutiny." NAACP v. Alabama, supra, (357 U.S.) at 460-461 (, 78 S.Ct. 1163, 1171, 2 L.Ed.2d 1488). Yet, it is clear that "(n) either the right to associate nor the right to participate in political activities is absolute." CSC v. Letter Carriers, 413 U.S. 548, 567 (, 93 S.Ct. 2880, 2891, 37 L.Ed.2d 796) (1973). Even a " 'significant interference' with protected rights of political association" may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgment of associational freedoms.
 
 
 111
 Id. at 25, 96 S.Ct. at 637-38 (emphasis supplied).
 
 
 112
 The Court's requirement that the government employ means closely tailored to the achievement of its asserted objectives is consistent with the approach taken in numerous First Amendment cases.[23] See, e. g., Village of Schaumburg v. Citizens For a Better Environment, 444 U.S. 620, 636, 100 S.Ct. 826, 836, 63 L.Ed.2d 73 (1980); Lehman v. City of Shaker Heights, 418 U.S. 298, 316-17, 94 S.Ct. 2714, 2724, 41 L.Ed.2d 770 (1974) (Brennan, J., dissenting); Police Dep't of Chicago v. Mosley, 408 U.S. 92, 99, 92 S.Ct. 2286, 2292, 33 L.Ed.2d 212 (1972). I conclude that there are at least two reasons for this requirement. First, the transcendent importance of unfettered speech and association in sustaining a free society requires that governmental speech or associational restrictions not be excessive or overbroad. Second, when the government uses restrictions which are not closely fitted to its asserted legitimate objectives, and those restrictions involve discrimination among speakers, it may appropriately be questioned whether the asserted legitimate (non-censorship) objectives were the government's actual reason for enacting the restriction. In this case, examination of the asserted purposes reveals governmental objectives that cannot withstand First Amendment scrutiny.
 
 B
 
 113
 The above analysis of Buckley makes it clear that the $5,000 restriction on contributions to a political committee challenged herein may be sustained under the First Amendment only if (1) the government's interests outweigh the impact on group/individual speech and associational freedoms; and (2) the restriction of unincorporated associations, but not corporations or labor organizations, is closely tailored to achieve the government's asserted interests. I would hold that section 441a(a)(1)(C), particularly when read in light of section 441b(b) (2)(C), cannot survive this especially stringent standard of review.
 
 
 114
 The speech and associational interests abridged by section 441a(a)(1)(C) are more substantial than the interests affected by the contribution limitations sustained in Buckley. In Buckley the contribution limitations governed contributions from a supporter to a candidate. The communication inhering in such contributions is simply that the contributor "supports" the candidate and his views. The Court found that this "symbolic expression of support," 424 U.S. at 21, 96 S.Ct. at 635, is adequately communicated by the act of contribution: the contribution's size is of "marginal" importance. Id. Regulating the amount of the contribution thus involves "little direct restraint on (the contributor's) political communication." Id.
 
 
 115
 In contrast, section 441a(a)(1)(C) limits donations from an unincorporated association to its own political mouthpiece as well as to other committees that share its views. The object of an unincorporated association's donations to a political committee is not merely to indicate "support" for the committee's views, but to use the instrument of a political action committee to voice its own ideas. Whereas in Buckley "the transformation of contributions into political debate involve(d) speech by someone other than the contributor," id., here this transformation is accomplished by the committee donors themselves, through a committee which, in large or small measure, they control. A limitation on donations to committees restricts not only funds available for contributions by the committees to candidates, but also the funds available for independent expenditures through the committee framework. It is by repeatedly forgetting this incontestable fact that the majority erroneously likens the section 441a(a)(1)(C) donation restriction to the contribution limitations upheld in Buckley. Section 441a(a)(1)(C) imposes "direct and substantial restraints on the quantity" of an unincorporated association's, and its members', "political speech."[24] Id. at 39, 96 S.Ct. at 644. The individual speech interests are therefore comparable to those affected by the expenditure limitations invalidated in Buckley.
 
 
 116
 The impact upon associational freedoms is even more substantial. Although it is true that section 441a(a)(1)(C), like the contribution limitations in Buckley, permits "like-minded persons to pool their resources in furtherance of common political goals," id. at 22, 96 S.Ct. at 636, unincorporated associations may annually donate no more than $5,000 in money or administrative support to political committees, while corporations and labor organizations may annually give such committees unlimited administrative support. Donors band together in economic support of a political committee so that the committee can compete effectively for attention in the marketplace of ideas, thereby "amplifying" the committee members' political views. See Buckley v. Valeo, supra, 424 U.S. at 22, 96 S.Ct. at 636; Note, The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments, 86 Yale L.J. 953, 957-61 (1977). Indeed, this "amplifying" ability of organizations and associations was "the original basis for the recognition of First Amendment protection of freedom of association." Buckley v. Valeo, supra, 424 U.S. at 22, 96 S.Ct. at 636. Although some unincorporated associations may be capable of amplifying their political views without the aid of a political action committee, not all unincorporated associations have the political and economic clout of a large organization like CMA. On its face, section 441a(a)(1)(C) prevents even a small unincorporated association from providing unlimited support to a separate political committee. Establishment and administration of such a committee, often a costly undertaking, may be essential to attract the financial support of outside donors. Only in conjunction with outside donors will some unincorporated associations be able to aggregate sufficient funds and expertise to compete effectively in the political marketplace with other more affluent "persons" capable of huge personal expenditures. The unrestricted right to engage in a favored type of political activity association in a political committee form is at issue. The restriction on an unincorporated association's right to participate unrestrained in this form of political activity goes to the heart of the associational right. See Cousins v. Wigoda, 419 U.S. 477, 95 S.Ct. 541, 42 L.Ed.2d 595 (1975). I would find, therefore, that the associational interest abridged by section 441a(a)(1)(C) is on a par with the associational interests unconstitutionally infringed by the expenditure limitations in Buckley.[25]
 
 
 117
 In contrast to these strong individual speech and associational interests, the government interest served by section 441a(a)(1)(C) is weak. Before its passage, the only limitation on the amount that a "person," including an unincorporated association, could contribute to a political committee was the $25,000 limitation on aggregate contributions by a single "individual." See 2 U.S.C. § 441a(a)(3). The purposes of the $5,000 limitation in section 441a(a)(1)(C) were discussed in the conference report accompanying S. 3065.
 
 
 118
 The conferees' decision to impose more precisely defined limitations on the amount an individual may contribute to a political committee, other than a candidate's committees, . . . is predicated on the following considerations: first, these limits restrict the opportunity to circumvent the $1,000 and $5,000 limits on contributions to a candidate; second, these limits serve to assure that candidates' reports reveal the root source of the contributions the candidate has received; and third, these limitations minimize the adverse impact on the statutory scheme caused by political committees that appear to be separate entities pursuing their own ends, but are actually a means for advancing a candidate's campaign.
 
 
 119
 H.R.Rep. No. 1057, 94th Cong., 2d Sess. 56-57 (1976), reprinted in 1976 Legislative History at 1051-52. These asserted reasons for section 441a(a)(1) (C) are just as insubstantial as those advanced in support of the expenditure limitations in Buckley. The purposes set forth in the conference report all involve preventing "persons" from using supposedly independent (of candidates) political action committees to funnel hidden contributions directly to candidates. But such misuse is reached elsewhere in FECA's statutory scheme. Section 441a(a)(7)(B)(i) states that expenditures "by any person in cooperation, consultation, or concert, with, or at the request or suggestion of, a candidate, his authorized political committees, or their agents, shall be considered to be a contribution to such candidate." Section 441a(a)(8) states that "all contributions made by a person, either directly or indirectly, on behalf of a particular candidate, including contributions which are in any way earmarked or otherwise directed through an intermediary or conduit to such candidate, shall be treated as contributions from such person to such candidate." Together, these sections ensure that all reported contributions to candidates, whether direct or indirect, are counted against the donor's permissible contribution under section 441a(a)(1).[26] Congress thus already has implemented a method for controlling circumvention of the contribution regulations which is less intrusive upon free speech than that challenged here.
 
 
 120
 In addition to the anti-circumvention purpose set forth in the legislative history and argued to us by the FEC, the majority asserts that Congress may have wished, by enacting section 441a(a)(1)(C), to curb the generalized corruptive threat posed by committees. The majority speculates that Congress may have intended, by restricting "persons' " donations to political committees to $5,000, to prevent not only "funnelling" of illegal contributions through committees to candidates, but also the accumulation of huge sums in these "vast, unaccountable, and low visibility centers of electoral influence that effectively detach candidates from their nominal geographic constituencies." See ante, p. 625.
 
 
 121
 One obvious objection to the majority's hypothesized congressional purpose for section 441a(a)(1)(C) is that this and similar statements about Congress' perception of the evils of committees are fabricated out of thin air. They find no support in the record, or in the legislative history. The 1979 study prepared at Harvard to look into the impact of FECA is no evidence of a congressional purpose in 1976, when section 441a(a)(1)(C) was enacted.
 
 
 122
 Beyond this, the majority's speculation violates the general rule that when performing strict scrutiny a court does not hypothesize conceivable governmental purposes in support of challenged legislation. Johnson v. Robison, 415 U.S. 361, 376-77, 94 S.Ct. 1160, 1170, 39 L.Ed.2d 389 (1974). See also, e. g., Schlesinger v. Ballard, 419 U.S. 498, 511, 95 S.Ct. 572, 579, 42 L.Ed.2d 610 (1975) (Brennan, J., dissenting). We are limited to evaluation of the purposes actually set forth by Congress. E. g., Johnson v. Robison, supra, 415 U.S. at 376, 94 S.Ct. at 1170; Cleveland Bd. of Educ. v. Lafleur, 414 U.S. 632, 641 n.9, 94 S.Ct. 791, 797 n.9, 39 L.Ed.2d 52 (1974). See generally, Gunther, Foreword: In Search of Enduring Doctrine on a Changing Court: A Model for a Newer Equal Protection, 86 Harv.L.Rev. 1 (1972). As the Supreme Court stated in Buckley, for example, a " 'significant interference with protected rights of political association' may be sustained if the State demonstrates a sufficiently important interest and employs means closely drawn to avoid unnecessary abridgement of constitutional freedoms." 424 U.S. at 25, 96 S.Ct. at 638. (Emphasis supplied.) The majority's speculation about why Congress might have desired to regulate committees violates the rule against hypothesizing objectives.
 
 
 123
 Even if it were permissible to consider an unarticulated congressional purpose to restrict generally the growth and power of political committees, the majority commits a serious category mistake by equating Congress' supposed effectuation of this purpose in section 441a(a)(1)(C) with the anti-corruption purpose that sustained the contribution limitations in Buckley. It is crucial to remember that Congress enacted the $1,000 limit on a "person's" contributions to candidates in order to thwart the corruptive quid pro quo of a direct gift to a candidate. The $5,000 limit on a political committee's contributions to candidates in section 441a(a)(2)(A) is the equivalent restriction on a committee's quid pro quo arrangements with candidates. Section 441a(a)(1)(C), in contrast, regulates an entirely different relationship: that of donor ("person") to committee. The purposes behind the contribution limits approved in Buckley and the donation restriction in section 441a(a)(1)(C) are necessarily distinguishable because a different relationship is being regulated. The majority simply ignores these differences which distinguish our case from Buckley. This leads in turn to the following error. The majority finds that Congress might desire to limit the growth of committees, so that they will not corrupt politicians. But the $5,000 limit on contributions to candidates already performs this anti-corruption function. Regulating the amounts that "persons" can donate to committees simply stifles the economic growth of a certain type of political association, a political committee, which is already subject to a $5,000 restriction on gifts to candidates.
 
 
 124
 Thus, no significant government anti-corruption objectives support the substantial infringement on speech and associational rights represented by section 441a(a)(1)(C). A "person's" contributions to its political action committee in no way implicate the quid pro quo concerns which supported the contribution limitations in Buckley. Such donations are not made to a candidate, and any contributions which the committee in turn makes to candidates are governed by the other contribution limitations set forth in section 441a. I would hold, therefore, using the method of analysis employed in Buckley, that no governmental interest outweighs the impact of section 441a(a)(1)(C) on group and individual speech and associational freedoms.
 
 
 125
 Furthermore, even if there were substantial anti-corruption reasons in favor of section 441a(a)(1)(C), the application of this limitation, in light of the administrative support restriction placed upon unincorporated associations but not upon corporations and labor organizations, is not carefully tailored to achieve the government's interests. There is no reason to think that support of a political action committee by an unincorporated association poses greater dangers of corruption than such support by a corporation or labor organization. It is true that corporations and labor organizations are totally disabled from making contributions directly to candidates while unincorporated associations are not. Yet this does not make corporations and labor organizations less likely to use administrative support to circumvent the especially stringent restrictions applicable to them. The corruption potential of administrative support of a political action committee is the same, whether the corruptor is incorporated or not. The majority offers no reasons why labor organizations and corporations are unlikely to misuse political committees. There are none. In such circumstances, the application of section 441a(a)(1) (C) to unincorporated associations but not to corporations and labor organizations is unconstitutionally underinclusive.
 
 
 126
 As mentioned earlier, the use of loosely fitted means to accomplish asserted governmental objectives may imply illegitimate governmental purposes. In this case, the application of restrictions to unincorporated associations, but not to corporations and labor organizations, in no way furthers a governmental objective of preventing corruption. Indeed, the majority and the FEC argue that this disparate treatment of unincorporated associations vis-a-vis labor organizations and corporations is justified by FECA's overall regulatory scheme. Because labor organizations and corporations are totally disabled from making direct contributions while unincorporated associations are not, it is argued that Congress simply equalized the various entities' respective speech opportunities by not including unincorporated associations in the administrative support exemption. That is, Congress muffled the unincorporated association voice in fairness to the already (though differently) muffled voice of corporations and labor organizations. The First Amendment, however, does not permit Congress to restrict differentially the speech of particular persons in an effort to achieve a harmonious balance. See First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 784-86, 98 S.Ct. 1407, 1420-21, 55 L.Ed.2d 707 (1978); Buckley v. Valeo, supra, 424 U.S. at 48-49, 96 S.Ct. at 649; Baldwin v. Redwood City, 540 F.2d 1360, 1369-70 (9th Cir. 1976), cert. denied, 431 U.S. 913, 97 S.Ct. 2173, 53 L.Ed.2d 223 (1977). "(T)he concept that government may restrict the speech of some elements of our society in order to enhance the relative voice of others is wholly foreign to the First Amendment." Buckley v. Valeo, supra, 424 U.S. at 48-49, 96 S.Ct. at 649. The statutory distinction between unincorporated associations and corporations or labor organizations is therefore not "tailored" to achievement of the government's only legitimate objectives, which are to reduce corruption and increase confidence in our electoral processes.[27]
 
 C
 
 127
 I would find that the restriction in section 441a(a)(1)(C), when read in light of the administrative support exemptions for corporations and labor organizations, imposes an inadequately justified burden on the speech and associational rights of members of an unincorporated association. I would thus hold that this section of FECA is unconstitutional on its face.
 
 
 128
 I am well aware that if my opinion were adopted, it would, until appropriate statutory modification, result in granting associations a special privilege to make unlimited donations to political committees, a privilege not extended to individual persons. I acknowledge that striking a portion of FECA would produce a consequence that is somewhat inconsistent with the remaining statutory scheme. This unwelcome and ironic result is forced upon me by the conflict between the First Amendment and Congress' drafting of the statute. That the result is distasteful to the majority does not constitute a valid reason for declining to enforce the First Amendment. Were the consequences of my reasoning to be deemed unfortunate, it would be up to the Congress to draft a statute which is both fair and in harmony with the First Amendment.
 
 
 129
 J. BLAINE ANDERSON, Circuit Judge, concurs in Part I of this opinion.
 
 
 130
 CHOY, J. BLAINE ANDERSON and HUG, Circuit Judges, concur in Parts II and III.
 
 
 131
 J. BLAINE ANDERSON and HUG, Circuit Judges, concur in Part IV.
 
 
 
 *
 Chief Judge Browning did not hear the arguments and has not participated in this decision. Subsequent to oral argument, Judges Ely and Trask took senior status and did not participate in this decision. See United States v. American-Foreign Steamship Corp., 363 U.S. 685, 80 S.Ct. 1336, 4 L.Ed.2d 1491 (1960). Subsequent to the oral argument, Judge Hufstedler resigned from the court and did not participate in this decision
 
 
 [1]
 The district court certified both the plaintiffs' and the defendants' questions, as follows:
 Plaintiffs' questions:
 a. Does the $5,000 calendar year limit established by 2 U.S.C. § 441a(a)(1)(C) on contributions to a political committee, when applied to contributions of administrative support as specified in § 441b(b)(2)(C) by CMA, an unincorporated association, to CALPAC, CMA's political action committee, violate the First and Fifth Amendments to the Constitution, when these provisions, and 2 U.S.C. §§ 431(e)(5)(F) and 431(f)(4)(H), on their face and as interpreted by the Federal Election Commission, allow unlimited contributions of such administrative support by corporations and labor organizations to their respective political action committee?
 b. Does the $5,000 calendar year limit established by 2 U.S.C. § 441a(a)(1)(C) on contributions to a political committee, when applied to CALPAC's receipt of contributions of administrative support as specified in § 441b(b)(2)(C) from CMA, an unincorporated association and CALPAC's connected organization as defined in 11 C.F.R. § 100.15, violate the First and Fifth Amendments to the Constitution when these provisions, and 2 U.S.C. §§ 431(e)(5)(F) and 431(f)(4) (H), on their face and as interpreted by the Federal Election Commission, allow receipt of unlimited contributions of such administrative support by political action committees sponsored by corporations and labor organizations?
 Defendants' questions:
 a. Do §§ 441b(b)(2)(C), 431(e)(5)(F) and 431(f)(4)(H), which on their face exclude expenditures by corporations and labor organizations for the establishment, administration and solicitation of contributions to a separate segregated fund to be utilized for political purposes from the definitions of contributions limited by § 441a(a), but do not on their face exclude expenditures for similar purposes by CMA, an unincorporated association, from the same definitions, violate plaintiffs' rights under the First and Fifth Amendments to the United States Constitution?
 b. Do §§ 441b(b)(2)(C), 431(e)(5)(F) and 431(f)(4)(H), which on their face exclude the receipt of contributions from corporations and labor organizations by separate segregated funds for the establishment, administration and solicitation of contributions to the separate segregated funds to be utilized for political purposes from the definitions of contributions limited by § 441a(a), but do not on their face exclude the receipt of contributions from CMA, an unincorporated association, by CALPAC from the same definitions, violate plaintiffs' rights under the First and Fifth Amendments to the United States Constitution?
 
 
 [2]
 We recognize that before the passage of the 1976 amendments there was no limitation on contributions by persons to political action committees. According to our analysis of the Supreme Court's Buckley opinion, Congress was empowered to limit contributions from persons to multicandidate political action committees to $1,000, inasmuch as we view the limits on committee contributions to be essentially similar to those on direct candidate contributions. Nevertheless, Congress enacted a more generous, $5,000, limitation on contributions by persons to political action committees
 
 
 [3]
 The $25,000 annual aggregate ceiling on contributions does not apply to associations, only to individuals. 2 U.S.C. § 441a(a)(3) (1976)
 
 
 [4]
 Because we do not accept the argument that the strictest possible scrutiny is the appropriate standard by which to review the contribution limitation at issue here, we consider a broader range of justifying purposes for the statutory limitation than would otherwise be appropriate. See, e. g., page 624, infra
 
 
 [5]
 A superficially plausible argument might be made that the effect of the limitation in restricting money spent by committees for independent expenditures, rather than for candidate contributions, should be given serious consideration in evaluating the constitutionality of the limitation. Consideration of the possible types of relations between persons and their political action committees vitiates this argument, however. If one were to assume a political action committee with a broad and diverse constituency of supporters, holding, in the aggregate, widely disparate views on the subjects of their committee's electioneering, then the symbolic, proxy-like character of their contributions to the committee, as opposed to true individual expenditures, becomes apparent. In the case of such a committee, the possible transformation and distortion of the contributing persons' views is most conspicuous, and therefore their act of contribution is that much removed from "core political expression." If we are to assume the opposite hypothesis, one in which a political committee precisely mirrors the views of a narrowly defined constituency of committee supporters, the similarity of the limitation to one on core political expression becomes closer, but the severity of the restriction's impact becomes that much less significant. This is because the "quantity of political expression" that would be achieved by the political action committee's expenditure of contributed funds for independent expenditures can be precisely equalled, both as to amount and content of the speech, merely by the individual members' independently spending money advocating the same objects that would otherwise be advocated by the political action committee. In any event, this issue is more apparent than real: the appellants focus in this case on the limitation's restriction of their ability to channel funds via multicandidate committees to candidates, and this is only to be expected, inasmuch as the chief, if not the sole, attractive feature of multicandidate political action committees is their enhanced ability to contribute money to candidates, five times an individual's ability
 
 
 [6]
 See 424 U.S. at 28 n.31, 96 S.Ct. at 639 n.31. This loophole has since been closed. See 2 U.S.C. § 441a(a)(5) (1976)
 
 
 [7]
 A complete discussion of this discriminatory effect and the level of scrutiny ordinarily applicable thereto is found in Nicholson, Buckley v. Valeo : The Constitutionality of the Federal Election Campaign Act Amendments of 1974, 1977 Wis.L.Rev. 323, 346-57. See Comment, Buckley v. Valeo: The Supreme Court and Federal Election Campaign Reform, 76 Colum.L.Rev. 852, 863-64 (1976)
 
 
 [8]
 There is some dispute over whether the different conclusions about different types of regulation in Buckley were the product of different levels of scrutiny, see The Supreme Court, 1975 Term, 90 Harv.L.Rev. 56, 178-79 (1976), or rather the product of the same analysis but with different results based on application to different regulations, see Note, The Unconstitutionality of Limitations on Contributions to Political Committees in the 1976 Federal Election Campaign Act Amendments, 86 Yale L.J. 953, 961-62 (1977). The distinction is narrowly semantic, but we assume the latter. See Comment, supra note 7, at 863-64
 
 
 [9]
 Pub.L.No.92-225, 86 Stat. 3 (1971), Reprinted in (1972) U.S.Code Cong. & Admin.News 3
 
 
 [10]
 See Comment, Corporate Political Action Committees: Effect of the Federal Election Campaign Act Amendments of 1976, 26 Cath.U.L.Rev. 756, 761-62 (1977). The Hansen Amendment was overshadowed by the 1971 Act's far more controversial limits on candidates' media spending. What little authoritative interpretation that there is of the Hansen Amendment's purpose can be gleaned from three sources: brief floor debate, see 117 Cong.Rec. 43,379-81 (1971); the Supreme Court's nearly contemporaneous construction of the amendment in Pipefitters Local 562 v. United States, 407 U.S. 385, 92 S.Ct. 2247, 33 L.Ed.2d 11 (1972), and the Federal Election Commission's Sun Oil advisory opinion, F.E.C. Advisory Opinion 1975-23, 40 Fed.Reg. 56,584 (1975)
 
 
 [11]
 See, e. g., 122 Cong.Rec. 7197-98 (1976) (remarks of Sen. Allen, author of amendment)
 
 
 [12]
 Title 11 C.F.R. § 114.1(b) (1979) and F.E.C. Advisory Opinion 1978-13, reprinted in (1978) Fed. Election Campaign Financing Guide (CCH) P 5319, do support this interpretation of the "establishment, administration, and solicitation" language of § 441b(b)(2)(C). It might have been more appropriate for the FEC to construe this language narrowly, such as by interpreting "administration" to mean the supplying of legal and accounting services necessary to comply with the Act. This would retain a parity between incorporated and unincorporated associations, because the latter can also supply these services to an unlimited extent. See 2 U.S.C. § 431(e)(4) (1976)
 
 
 [13]
 Any suggestion that our approval of the different regulatory mechanisms used in the case of corporations and labor unions, on the one hand, and associations, on the other, is the same as the impermissible "differential muffling" that was disapproved in First National Bank, supra, 435 U.S. at 788-92, 98 S.Ct. at 1422-24, rests on an inapposite analogy between the issues and holdings in that case and in ours
 
 
 [1]
 This would be even more obvious if there were several separate statutes, one for each of the specified categories of "persons" and one catchall statute
 
 
 [1]
 Section 437h, as amended by Federal Election Campaign Act Amendments of 1979, Pub.L.No.96-187, § 112(c), 93 Stat. 1366, states as follows:
 (a) The Commission, the national committee of any political party, or any individual eligible to vote in any election for the office of President may institute such actions in the appropriate district court of the United States, including actions for declaratory judgment, as may be appropriate to construe the constitutionality of any provision of this Act. The district court immediately shall certify all questions of constitutionality of this Act to the United States court of appeals for the circuit involved, which shall hear the matter sitting en banc.
 (b) Notwithstanding any other provision of law, any decision on a matter certified under subsection (a) of this section shall be reviewable by appeal directly to the Supreme Court of the United States. Such appeal shall be brought no later than 20 days after the decision of the court of appeals.
 (c) It shall be the duty of the court of appeals and of the Supreme Court of the United States to advance on the docket and to expedite to the greatest possible extent the disposition of any matter certified under subsection (a) of this section.
 
 
 [2]
 I know of no principled basis on which to distinguish this case from many politically volatile matters that three-judge panels of this circuit normally confront. Suppose that the next constitutional challenge to a FECA regulation occurs outside of an election year. Will the issue still be of "exceptional importance"? If not, is our principled basis for the importance of a case to be governed by an election calendar? What makes the constitutional issues posed in the case before us so different in kind as to require such special treatment? Why should some perceived need for haste in the instant case counsel use of the unwieldly and extremely time-consuming en banc procedure? Absent intra-circuit conflict, I had thought that the en banc procedure, and the prolonged, careful deliberation that should accompany it, would be reserved for cases of great moment
 
 
 [3]
 The District of Columbia Circuit in Buckley, like the majority, did not reach the question which I believe must be confronted: whether the procedure provided in section 437h(a) is constitutional. It "took care"
 to base its decision to hear the case en banc upon Rule 35(a) of the Federal Rules of Appellate Procedure and upon the statutory enactment of long-standing judicial custom, 28 U.S.C. § 46(c), so as not to foreclose later argument under separation of powers that Congress may not compel a sitting en banc, as the plain words of § 437h would imply.
 Buckley v. Valeo, 519 F.2d 821, 902 n.2 (D.C. Cir. 1975) (per curiam), aff'd in part, 424 U.S. 1, 96 S.Ct. 612, 46 L.Ed.2d 659 (1976) (per curiam).
 
 
 [4]
 The FEC investigation commenced in 1978. The FEC determined, on April 19, 1979, that there was probable cause to believe CMA and CALPAC had violated these provisions. The plaintiffs filed the instant action on May 7, 1979. The FEC filed its civil enforcement action against CMA and CALPAC in district court 16 days later
 
 
 [5]
 During the House discussion of the Conference Committee Report, Committee Chairman Hays recognized Congress' careful balancing of the avenues of judicial review available under the enforcement mechanism and section 437h. He stated:
 Under section 315 (codified as 2 U.S.C. § 437h) persons challenging the constitutionality of any provision of the act, retain their right to do so in court without exhausting administrative remedies to the extent the courts have jurisdiction under established principles. The delicately balanced scheme of procedures and remedies set out in the act is intended to be the exclusive means for vindicating the rights and declaring the duties stated therein.
 
 
 [120]
 Cong.Rec. 35134 (1974), reprinted in 1974 Legislative History at 1108
 
 
 [6]
 District courts have similarly viewed the interaction of section 437h(a) and the enforcement mechanisms. See, e. g., Martin Tractor Co. v. FEC, 460 F.Supp. 1017, 1019 (D.D.C.1978); United States v. Clifford, 409 F.Supp. 1070, 1072 (E.D.N.Y.1976)
 
 
 [7]
 28 U.S.C. § 46(c) now states:
 Cases and controversies shall be heard and determined by a court or panel of not more than three judges, unless a hearing or rehearing before the court in banc is ordered by a majority of the circuit judges of the circuit who are in regular active service. A court in banc shall consist of all circuit judges in regular active service.
 
 
 [8]
 The Rules of Appellate Procedure are promulgated by the Supreme Court pursuant to its authority under 28 U.S.C. §§ 2072, 2075 and 18 U.S.C. §§ 3771, 3772 "to make rules of practice and procedure for all cases within the jurisdiction of the courts of appeals," Fed.R.App.P. 1, Notes of Advisory Committee on Appellate Rules
 
 
 [9]
 I am aware of only one statute other than 2 U.S.C. § 437h(a) and 28 U.S.C. § 46 in which Congress has authorized en banc proceedings. 28 U.S.C. § 2109, enacted simultaneously with section 46, provides for en banc convocation of the appropriate court of appeals, at the Chief Justice's discretion, to hear a case brought to the Supreme Court on direct appeal from a district court when the Supreme Court lacks a quorum. This rarely used provision is not inconsistent with the general rule that en banc hearings are confined to "exceptional" cases
 
 
 [10]
 See Leventhal, Courts and Political Thickets, 77 Col.L.Rev. 345, 384-87 (en banc hearings are counterproductive in terms of expediting determination of serious constitutional questions)
 
 
 [11]
 The District of Columbia Circuit has stated that section 437h(a) does not vitiate the various prudential standing considerations which limit the federal courts' exercise of decisional and remedial powers. Clark v. Valeo, 559 F.2d 642, 650 n.11 (D.C.Cir.) (per curiam) (Congress cannot "command" the judiciary to act contrary to prudential ripeness rules), aff'd sub nom., Clark v. Kimmitt, 431 U.S. 950, 97 S.Ct. 2667, 53 L.Ed.2d 267 (1977). Cf. Clark v. Valeo, supra, 559 F.2d at 660-64 (Leventhal, J., concurring) (actions for declaratory relief brought pursuant to section 437h are subject to those concerns, including ripeness, inherent in equity jurisdiction); Leventhal, Courts and Political Thickets, 77 Col.L.Rev. 345, 387 (1977) (prudential considerations available to prevent "undercutting of fundamentals of the judicial process"). Contra, Clark v. Valeo, supra, 559 F.2d at 669 (Robinson, J., dissenting) ("(Section 437h) is coextensive with the constitutional maximum of adjudicative authority, observing no limit save the existence of a case or controversy. . . . Prudential considerations, so viable in ordinary cases, have no role in disputes cognizable under Section 437h."); Bread Political Action Comm. v. FEC, 591 F.2d 29, 34 & n.8 (7th Cir. 1979) (same)
 The District of Columbia Circuit's interpretation of section 437h(a) seems to ignore the Supreme Court's statement in Buckley that "Congress . . . intended to provide judicial review to the extent permitted by Art. III." Buckley v. Valeo, supra, 424 U.S. at 11-12, 96 S.Ct. at 631 (footnote omitted). There can be no doubt that Congress can obviate prudential restrictions. As the Supreme Court has explicitly stated, "Congress may grant an express right of standing to persons who otherwise would be barred by prudential standing rules." Warth v. Seldin, 422 U.S. 490, 501, 95 S.Ct. 2197, 2206, 45 L.Ed.2d 343 (1975). Congress has done so in section 437h(a). I therefore do not consider the effect of prudential limitations in the exercise of jurisdiction in this case.
 
 
 [12]
 "Persons" also cannot contribute more than $1,000 to any candidate with respect to an election for federal office, 2 U.S.C. § 441a(a)(1)(A), or more than $20,000 per year to a national political party's committee, 2 U.S.C. § 441a(a)(1)(B). Corporations and labor organizations cannot make any direct contributions or expenditures with respect to federal elections. 2 U.S.C. § 441b(a). Thus, corporations and labor organizations, unlike unincorporated associations, may not contribute $1,000 directly to a candidate or $20,000 per year to a national committee. None of these provisions is challenged in the case before us
 
 
 [13]
 The exemption in section 441b(b)(2)(C) applies outside of section 441b, and thus to the contribution limitations in section 441a(a)(1)(C), by virtue of the general definition, for all FECA purposes, of "contribution" in section 431(e)(5)(F). Section 431(e)(5)(F) specifically excludes from the definition of "contribution" any provision of administrative support pursuant to section 441b(b)(2)(C). Section 431(f)(4)(H) similarly excludes such administrative support from the definition of expenditures
 
 
 [14]
 The term "political committee," as defined in 2 U.S.C. § 431(d), means, among other things, a "separate segregated fund" established pursuant to 2 U.S.C. § 441b(b)(2)(C). See Federal Election Campaign Act Amendments of 1979, Pub.L.No.96-187, § 301(4)(B), 93 Stat. 1339 (amending 2 U.S.C. § 431(d) (1974)). Thus, if section 441b(b)(2)(C) exempted unincorporated associations, they would be permitted to provide unlimited support to political committees such as CALPAC
 
 
 [15]
 The FEC urges that our jurisdiction, pursuant to section 437h(a), to review only questions of facial constitutionality precludes the possibility of a statutory construction to avoid the constitutional question. I disagree. In Buckley v. Valeo, supra, the Court, acting pursuant to section 437h, construed FECA's expenditure limitations to avoid an unconstitutional vagueness problem. See id. 424 U.S. at 40-44, 96 S.Ct. at 645-46. See also FEC v. Central Long Island Tax Reform Immediately Committee, 616 F.2d 45 (2d Cir. 1980). Moreover, construction and interpretation of a statute are always necessary prior to testing the statute against constitutional requirements; the constitutional issue cannot be framed until the statute is clearly understood
 
 
 [16]
 In introducing his amendment Senator Allen stated:
 Mr. President, all this amendment does is to cure an omission in the bill. It would allow corporations that do not have stock but have a membership organization, such as a cooperative or other corporations without capital stock and, hence, without stockholders, to set up separate segregated political funds as to which it can solicit contributions from its membership; since it does not have any stockholders to solicit, it should be allowed to solicit its members. That is all that the amendment provides. It does cover an omission in the bill that I believe all agree should be filled.
 
 
 [122]
 Cong.Rec. 7197-98 (1976), reprinted in 1976 Legislative History at 464. See also 122 Cong.Rec. 12468-69 (May 4, 1976), reprinted in 1976 Legislative History at 1107-08 (Remarks of Sen. Allen)
 
 
 [17]
 Even if one held fast (despite legislative history to the contrary) to the first-blush interpretive premise that the term "membership organization," as used in section 441b(b)(2)(C), includes unincorporated associations, the section 441b(b)(2)(C) exemption would still not enable an unincorporated association to provide unlimited administrative support to a political committee. The obstacle of the $5,000 restriction in section 441a(a)(1)(C) would remain, because sections 431(e)(5)(F) and (f)(4)(H) which exclude corporate and labor donations of administrative support to separate segregated funds from the definitions of "contribution" and "expenditure," do not mention "membership organizations." The result is that "membership organizations," unlike corporations and labor organizations, remain governed by the $5,000 restriction in section 441a(a)(1)(C) on "contributions" to political committees. I have chosen to rely directly on the legislative history of section 441b(b)(2)(C) rather than on this apparent anomaly in the statutory framework; nevertheless, the omission of the term "membership organization" in sections 431(e)(5)(F) and (f)(4)(H) provides additional support for the conclusion that the section 441b(b)(2)(C) exemption is not available to unincorporated associations
 
 
 [18]
 This administrative support exemption for corporations and labor organizations applies to section 441a(a)(1)(C) by virtue of the section 431(e) (5)(F) and (f)(4)(H) definitions of "contributions" and "expenditures."
 
 
 [19]
 The Court in Buckley also considered and rejected the plaintiffs' Fifth Amendment equal protection challenge to FECA's Subtitle H, which provides for public financing of election and primary campaigns. The plaintiffs there contended that the primary financing is unconstitutional because candidates not running in party primaries receive no primary funds. The Court responded:
 In not providing assistance to candidates who do not enter party primaries, Congress has merely chosen to limit at this time the reach of the reforms encompassed in Chapter 96. This Congress could do without constituting the reforms a constitutionally invidious discrimination. The governing principle was stated in Katzenbach v. Morgan, 384 U.S. 641, 657 (, 86 S.Ct. 1717, 1727, 16 L.Ed.2d 828) (1966):
 "(I)n deciding the constitutional propriety of the limitations in such a reform measure we are guided by the familiar principles that a 'statute is not invalid under the Constitution because it might have gone farther than it did,' Roschen v. Ward, 279 U.S. 337, 339 (49 S.Ct. 336, 73 L.Ed. 722), that a legislature need not 'strike at all evils at the same time,' Semler v. Dental Examiners, 294 U.S. 608, 610 (55 S.Ct. 570, 571, 79 L.Ed. 1086), and that 'reform may take one step at a time, addressing itself to the phase of the problem which seems most acute to the legislative mind,' Williamson v. Lee Optical Co., 348 U.S. 483, 489 (75 S.Ct. 461, 465, 99 L.Ed. 563)."
 Buckley v. Valeo, supra, 424 U.S. at 105, 96 S.Ct. at 676.
 The Court thus accorded the challenged Subtitle H provisions only minimal, "rational basis," scrutiny. The plaintiffs in Buckley had argued that the rational basis test used in Katzenbach v. Morgan "is inapplicable to this case involving First Amendment guarantees." Id. at 105 n.143, 96 S.Ct. at 676 n.143. But the Court rejected this contention, stating: "(T)he argument as to the denial of funds to certain candidates primarily claims invidious discrimination and hence presents Fifth Amendment questions, though with First Amendment overtones, as in Katzenbach v. Morgan." Id.
 The reasoning in Katzenbach and Buckley does not control here. In Katzenbach, the Court upheld a statute, enacted pursuant to section 5 of the Fourteenth Amendment, which permitted citizens educated through the sixth grade in American flag schools, but who did not speak English, to vote. The statute was particularly designed to franchise New York City's Puerto Rican immigrant citizens, many of whom had been educated solely in Spanish in Puerto Rico. The plaintiffs urged that Congress violated the Fifth Amendment by limiting the provision to American flag schools. In deciding to apply minimal scrutiny, the Court said:
 (T)he principle that calls for the closest scrutiny of distinctions in laws denying fundamental rights . . . is inapplicable; for the distinction challenged by appellees is presented only as a limitation on a reform measure aimed at eliminating an existing barrier to the exercise of the franchise.
 Katzenbach v. Morgan, supra, 384 U.S. at 657, 86 S.Ct. at 1727 (emphasis in original). The FECA provisions at issue here, unlike Subtitle H in Buckley and the reform measure in Katzenbach, are newly imposed barriers to speech, albeit designed to reform national elections. They are positive restrictions on speech and association. The First Amendment overtones were ancillary in Buckley (regarding Subtitle H) and in Katzenbach, because the challenged statutes did not restrict speech. In the case before us, the First Amendment overtones are paramount; the alleged discrimination is thus properly considered within First Amendment analysis.
 
 
 [20]
 The Court in Buckley did consider the claim that the contribution restrictions "work such an invidious discrimination between incumbents and challengers that the statutory provisions must be declared unconstitutional on their face." Buckley v. Valeo, supra, 424 U.S. at 30-31, 96 S.Ct. at 640 (footnote omitted). But the Court held that, "(a)bsent record evidence of invidious discrimination against challengers as a class, a court should generally be hesitant to invalidate legislation which on its face imposes evenhanded restrictions. Cf. James v. Valtierra, 402 U.S. 137 (, 91 S.Ct. 1331, 28 L.Ed.2d 678) (1971)." Id. at 31, 96 S.Ct. at 641. The Court found no evidence of such discrimination in the record, and thus rejected plaintiffs' discrimination contention without defining the appropriate standard of review. Id. at 32, 96 S.Ct. at 641
 
 
 [21]
 In United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), the Court sustained a war protestor's conviction, pursuant to a federal statute prohibiting the knowing destruction of a draft card, for burning his draft card on the steps of a courthouse. The Court believed that the law prohibiting the destruction of draft cards was "unrelated to the suppression of free expression," id. at 377, 88 S.Ct. at 1679, and that any "incidental restriction on alleged First Amendment freedoms (was) no greater than (was) essential to the furtherance of (the government's) interest," id., in smooth administration of the Selective Service System
 The Court in Buckley expressly distinguished O'Brien on the basis that FECA's contribution and expenditure regulations, unlike the statute challenged in O'Brien, arose " 'in some measure because the communication allegedly integral to the conduct (was) itself thought to be harmful.' " Buckley v. Valeo, supra, 424 U.S. at 17, 96 S.Ct. at 634, quoting United States v. O'Brien, supra, 391 U.S. at 382, 88 S.Ct. at 1682. Therefore, the Court considered the FECA limitations, at least "in some measure," to be directly designed to suppress communication, and hence, free expression.
 The expression which Congress hoped to curb by the contribution regulations is, roughly: "Here is $100,000. Now I have your vote in my pocket." Clearly, as in subversive speech, see Brandenburg v. Ohio, 395 U.S. 444, 89 S.Ct. 1827, 23 L.Ed.2d 430 (1969) (per curiam), the evil exists in the content of the communication to the candidate. The harm corruption flows from the content of the contributor's message. Thus, the Court in Buckley correctly distinguished O'Brien, in which the harm was not related to the war protestor's message, but rather to his conduct destruction of a draft card needed by the Selective Service Administration for administrative purposes.
 The "exacting scrutiny," Buckley v. Valeo, supra, 424 U.S. at 16, 96 S.Ct. at 633, accorded legislative curbing of harms flowing from the content of particular persons' or groups' speech does not normally include balancing of government interests against individual speech and association rights. See, Ely, Flag Desecration: A Case Study in the Roles of Categorization and Balancing in First Amendment Analysis, 88 Harv.L.Rev. 1482, 1491 (1975). Cf. Brandenburg v. Ohio, supra, 395 U.S. at 447, 89 S.Ct. at 1829 (state may "proscribe advocacy of use of force or of law violation (only) where such advocacy is directed to inciting or producing imminent lawless action and is likely to incite or produce such action."). Yet in Buckley, even after distinguishing O'Brien, the Court implicitly adopted the O'Brien method: it weighed and balanced the respective individual and governmental interests and tested the nexus between the government's anti-corruption objective and the means chosen to effectuate it the contribution and expenditure limitations by a "less restrictive alternative" (are the means "essential" to the end?) mode of analysis. Of course, even the "categorization" approach which typically describes "exacting scrutiny," see Cohen v. California, 403 U.S. 15, 24, 91 S.Ct. 1780, 1787, 29 L.Ed.2d 284 (1971), Ely, supra, at 1490-93, presupposes some balancing to find the margins of scrupulously protected categories. See L. Tribe, American Constitutional Law, § 12-2, at 583 (1978). But I am unaware of any prior instance in which the Court, after describing a government action as related to the suppression of the communicative impacts of speech, asked simply whether the governmental objective was important and whether it could be accomplished less restrictively.
 The standard of review actually utilized by the Court in Buckley is thus difficult to pinpoint. The Court stated it would use the exacting scrutiny test, but the interest balancing which dominates its analysis leaves me in doubt. I do, of course, follow Supreme Court precedent and, therefore, adopt the balancing approach, which most clearly explains the Court's analysis in Buckley. I confess, however, my inability to identify specifically the analytical framework adopted by the Court.
 
 
 [22]
 2 U.S.C. § 441a(a)(1)(A)
 
 
 [23]
 While the Court's use in Buckley of an interest-balancing standard of review to analyze a legislative regulation of content-related harms seems difficult to square with its careful distinguishing of United States v. O'Brien, 391 U.S. 367, 88 S.Ct. 1673, 20 L.Ed.2d 672 (1968), at the outset of its opinion (see note 21 supra ), once the Court embarked on an interest-balancing inquiry, it adhered to the balancing analysis traditionally employed in First Amendment cases such as O'Brien : it questioned whether the challenged regulations were closely related to the achievement of important governmental interests
 
 
 [24]
 It is true, of course, that "persons," including unincorporated associations, remain free to make independent expenditures other than through political committees. It might be argued, therefore, that the restriction on use of the political action committee vehicle for political speech purposes is but a limitation on the manner, as opposed to the extent, of an unincorporated association's political speech. See Buckley v. Valeo, supra, 424 U.S. at 18 n.17, 96 S.Ct. at 634 n.17. But even restrictions on just the manner of speech must be closely tailored to the achievement of substantial governmental interests. E. g., Police Dep't of Chicago v. Mosley, 408 U.S. 92, 99, 101, 92 S.Ct. 2286, 2292, 2293, 33 L.Ed.2d 212 (1972); see cases cited on this issue at page 641. Thus, whether the $5,000 restriction is viewed as an extent restriction, or as a manner restriction, the government interests asserted in its support must be closely scrutinized. As I discuss, the government interests are weak and unnecessary
 
 
 [25]
 Congress' use of the term "contribution" in section 441a(a) to describe its regulation of donations to political committees is of course unimportant to the issues at hand: the Court's analysis in Buckley makes it clear that speech and associational considerations, not semantic considerations, govern these First Amendment issues
 
 
 [26]
 In addition, 2 U.S.C. § 441a(a)(5), the so-called "non-proliferation" provision, regulates the creation of multiple political committees subject to common control through which a "person," labor organization, or corporate entity can funnel contributions to candidates. For purposes of the section 441a(a)(1) contribution limitations, all contributions by political committees "established or financed or maintained or controlled" by the same entity (including by "persons," hence unincorporated associations are covered) are aggregated as if from a single political committee. 2 U.S.C. § 441a(a)(5)
 
 
 [27]
 This case does not present the issue of whether the absolute bar on labor and corporate contributions directly to candidates violates the First Amendment. The Supreme Court has not yet resolved this question. See First Nat'l Bank of Boston v. Bellotti, 435 U.S. 765, 788 n.26, 98 S.Ct. 1407, 1422 n.26, 55 L.Ed.2d 707 (1978). The Court in First National Bank observed, without reaching the issue, that "Congress might well be able to demonstrate the existence of a danger of real or apparent corruption in independent expenditures by corporations to influence candidate elections." Id. at 788 n.26, 98 S.Ct. at 1422 n.26; see Comment, The Regulation of Union Political Activity: Majority and Minority Rights and Remedies, 126 U.Pa.L.Rev. 386, 408-10 (1977). For additional articles on this issue, see citations in Houdek and Ford, The Federal Election Campaign Act and Its Amendments: A Selected Legal Bibliography with Annotations, 72 Law Lib.J. 194, 207-208 (1979)